554 So.2d 1270 (1989)
Michael Allen DUHON and Mary Kathryn Duhon, Plaintiffs-Appellants,
v.
PETROLEUM HELICOPTERS, INC., etc., Defendants-Appellees.
No. 88-875.
Court of Appeal of Louisiana, Third Circuit.
December 13, 1989.
Rehearing Denied January 23, 1990.
*1272 Keaty & Keaty, Robert B. Keaty, Lafayette, for plaintiffs-appellants.
McGlinchey, Stafford, Mintz, Cellini & Lang, Ken Laborde and Sharon Gross, New Orleans, for PHI and AVCO.
Roy & Forrest, L. Albert Forrest, New Iberia, for AVCO.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Donald O. Collins, New Orleans, for Aerospatiale Helicopter.
McBride, Foret, Rozas & Leonard, Robert R. McBride, Lafayette, for USF & G.
Phelps, Dunbar, Marks, Claverie & Sims, Howard Daigle, Jr., New Orleans, for Garrett Corp.
Taylor, Porter, Brooks & Phillips, W. Luther Wilson, Baton Rouge, for Parker.
Before DOMENGEAUX, YELVERTON and KING, JJ.
YELVERTON, Judge.
Michael Allen Duhon was a passenger aboard a helicopter which was involved in two accidents in 1983 in the Gulf of Mexico. Claiming personal injuries suffered from both incidents, he and his wife, Mary Kathryn Duhon, sued multiple parties, the number of which by the time of trial were reduced to four: Petroleum Helicopters, Inc. (PHI), the owner of the aircraft; AVCO-Lycoming, the manufacturer of the engine that powered the aircraft; Aerospatiale Helicopter Corporation and its parent company, Societe Nationale Industrielle Aerospatiale (collectively, Aerospatiale), the manufacturer of the aircraft; and John Airington, the pilot on both occasions.
Basing their claims on the strict liability provisions of Louisiana tort law and also on the general maritime law, Duhon asked for compensatory damages and punitive damages, and his wife sought an award for loss of consortium. After a three week trial, the trial judge directed a verdict finding that Duhon was not contributorily negligent. The case was given to the jury in the form of a special verdict consisting of nine interrogatories, and the jury was instructed to answer at least the first eight. The jury responded to Interrogatory No. 1 of the special verdict by finding that Duhon suffered "injuries or an aggravation of a pre-existing condition", caused by one or the other, or both, of the landings at sea. The jury found that no defendant was liable. The jury then determined that Michael Duhon had $112,000 in damages and his wife had $10,000 in damages.
In post-verdict proceedings, the trial judge set aside the jury verdict as to the liability of PHI and AVCO-Lycoming, and found that those defendants were liable. The trial court denied the plaintiffs' motion for a new trial.
The plaintiffs have appealed claiming error in the failure to find Aerospatiale liable and in the failure to award punitive damages, and seeking an increase in the award. They alternatively asked for a new trial based upon the discovery of new evidence, and four allegedly erroneous evidentiary rulings by the trial judge.
The two defendants who were cast in judgment also appealed. PHI assigns as error the directed verdict against it, arguing that the strict liability provision of La. C.C. art. 2317 is inapplicable in a suit under the general maritime law. AVCO-Lycoming assigns as error the directed verdict against it, arguing that there was no proof its engine was defective in either design or manufacture. The defendants do not complain on appeal of the amount of damages awarded.

THE AUTOROTATIONS AT SEA
Michael Duhon, age 28 at the time of trial, was employed by Southern Petroleum *1273 Laboratories of Lafayette, Louisiana, as a meter technician. His work required him to be transported from the shore base in Lafayette to offshore oil platforms in the Gulf of Mexico well beyond a marine league from the Louisiana coast. His employer had contracted with PHI to ferry him by helicopter to these locations.
On March 31, 1983, Duhon was the sole passenger on one of PHI's helicopters, an A-Star AS350D, powered by an AVCO-Lycoming LTS 101 engine, flown by John Airington, headed to a platform some 35 miles offshore, when the engine quit at an altitude of 1,000 to 1,500 feet. The pilot autorotated the aircraft safely to the water. An autorotation descent of a helicopter was described by the experts as a procedure by which a pilot brings the aircraft more or less straight down, so that the updraft of air turns the main rotor providing lift to the helicopter and slowing its descent, much like a parachute. In accordance with applicable Federal Aviation Administration (F.A.A.) directives this landing was categorized as an "incident", rather than a crash, because the helicopter sustained no damage and there were no apparent injuries to its occupants. The pilot testified that the aircraft landed with a jolt on touchdown. Flotation devices, called ditchbags, attached to the main landing gear, kept the helicopter afloat until a rescue vessel arrived about two hours later. In the meantime, the plaintiff and the pilot climbed on top of the helicopter and sat there and talked and waited. When the rescue boat arrived plaintiff jumped from the helicopter to the boat ladder, and while he was on the ladder wave action caused the nose of the aircraft to pin him momentarily against the vessel. This did not cause any apparent injuries and the plaintiff boarded the boat`and went ashore.
An investigation following the incident of March 31, 1983, revealed that the engine quit running because a blade on the gas producer rotor of the engine failed as a result of vibrator stress.
About four months later, on July 26, Duhon was a passenger on the same aircraft piloted again by John Airington, when it once more autorotated into the Gulf of Mexico. The evidence rather conclusively established, bolstered by the plaintiff's own pretrial admission, that this was a soft landing, and that plaintiff suffered no injuries as a result of this incident. The cause of this incident was again the failure of an LTS 101 engine, although not the same engine involved in the earlier incident. An investigation resulted in a finding that the cause of this incident might have been the clogging of the fuel manifolds, but the engine was so badly corroded due to exposure to salt water when one of the flotation devices failed, that the experts were unable to say exactly what caused this engine failure.
The trial of the case took place four years after these incidents occurred, and massive discovery took place during that time. At trial plaintiff attempted to show that structural damage to the aircraft following the July 26 landing proved that it was a hard landing, or a crash, rather than a soft landing. The great weight of the evidence, however, indicates otherwise. After the helicopter landed, one of the flotation devices burst causing the aircraft to turn over in the water, but all of this occurred after plaintiff had left the plane and boarded an inflatable raft. The aircraft was thereafter towed in the water to a nearby platform, and the expert testimony indicated that it was this towing of the partially submerged aircraft in heavy seas that caused the structural damage, and not the landing itself.
Inasmuch as the evidence conclusively establishes that whatever injuries plaintiff suffered were incurred as a result of the March 31 incident, and not the July 26 soft landing, we consider it unnecessary to spend any more time discussing the July 26 landing.

A PARIAH IN THE HELICOPTER INDUSTRY?
The plaintiffs undertook to convince the jury that the A-Star AS350D aircraft with its AVCO-Lycoming LTS 101 engine was what they described as a "pariah in the helicopter industry". They attempted to *1274 show that AVCO-Lycoming and PHI administrative personnel, as well as Aerospatiale, knew that all LTS 101 engines were unreliable, and that, nevertheless, the engines were kept in use. It was this alleged conduct on which they based their claim for punitive damages. Believing that if there was proof of the elements for punitive damages, all other proof requirements to show fault would take care of themselves, their strategy was throughout to present a punitive damage case.
There was a defect in the LTS 101 engine that failed on March 31. Robert K. Phillips, an expert in aircraft accident investigation and failure analysis, testified by deposition for the plaintiffs. He opined and this fact is conceded by the defendantsthat the March 31 power loss was related to a separation of a gas producer blade, caused by metal fatigue, a mechanical failure in the engine. This is what caused the helicopter to have to go down.
Another expert witness, Guido Semprebon, an aeronautical engineer formerly employed by AVCO-Lycoming, examined the blade and explained that it failed due to vibratory stress fatigue. According to him, this is a problem that is anticipated in the design and manufacture of the blade, but, because of the tolerance that the blade is manufactured to in the casting, no two castings and no two blades are exactly alike. One could be stronger or weaker. This witness said, "The material equalizer could be different and a blade now and then gets excited". He said there then can occur an "upstream excitation". He knew of 18 or 20 AVCO-Lycoming engines in which this fatigue failure occurred, but that was before blade dampers were incorporated into rotors to control vibratory stresses. The engine involved in this case did not have blade dampers.
In the helicopter industry, problems with new equipment are apparently normal and expected. Thomas W. Beavers, an operations inspector for the F.A.A. so testified. An experienced helicopter pilot himself, Beavers was an inspector from 1970 to 1986. He worked out of the Baton Rouge F.A.A. office, and one of his main responsibilities was to oversee the operations of PHI. He was called as a witness for PHI. He testified that he never had any information or knowledge that the A-Star was an unsafe aircraft. Beavers was extensively cross-examined by the plaintiffs covering, in depth, such general subjects as autorotation procedures, reporting procedures required by the F.A.A. and the National Transportation Safety Board (N.T.S.B.), and how to assess damage to aircraft. The subject of the LTS 101 engine was barely mentioned. Here is the complete cross-examination testimony on that subject:
Q Anytime before July of 1983 in respect to your job at PHI and other operators, did you ever have occasion to come across information pertaining to the problems experienced by operators with the LTS 101 engine?
. . . . .
A Yes.
. . . . .
Q Can you tell us what it was Mr. Beavers?
A No, sir. I just know that there were some failures and some corrective action taken. We would get correspondence through telling whatthat the airworthiness inspectors must do to go out and see that these things were done. As all new enginesthis was a new engine builtI'm not sure for just this aircraft, but it wasthis little, small engine was new and it was some problems, as all new equipment comes out with problems. But, there was just corrective action, is what I'm talking about. that's what I would read aboutthe correction action that the F.A.A.'s taken on it.
None of the people close to this aircraft at PHI ever had any problems with the engine except the two incidents involved in this case. Vernon Elias Albert, vice-president and chief pilot for PHI, testified that in 1983 he was aware that there had been some engine failures in the LTS 101. However, except for the failures with which this case is concerned, it does not appear that PHI had itself ever experienced any of these problems. Warren J. Cabaret, Jr., *1275 Director of Flight Safety, testified that he never heard any complaints about the LTS 101 engine, and that PHI was happy with the engine. Similar testimony was given by Frank W. Lee, PHI's president, who declared that there never were any unusual problems with the LTS 101. He said if he had ever thought that there were real problems, he would have grounded the equipment. The pilot, Airington, testified that he had been flying this aircraft, with the LTS 101 engine, for three years, and had complete confidence in it.
We go next to an explanation of the role that the jury played, and the role that the trial judge played, in fashioning the judgment that is before us on appeal. After that explanation, we will discuss the liability issues, the sufficiency of the award, and whether the evidentiary rulings were prejudicially erroneous.

WHAT THE JURY DID
The jury was instructed that ordinary negligence principles applied to the conduct of PHI. The jury was told that negligence was the failure to use reasonable care. The trial judge charged the jury that products liability law applied to the conduct of AVCO-Lycoming and Aerospatiale and explained what that was. In the damages part of the jury instructions, punitive damages were discussed, and the jury was told it could award punitive damages if it found that a defendant was "guilty of gross negligence or actual malice or criminal indifference, which is the equivalent of reckless and wanton misconduct".
The jury was asked to render its verdict in the form of answers to interrogatories. Here are the interrogatories, and the jury's responses, to the first eight questions:
1. Do you find that Michael Duhon suffered injuries or an aggravation of a pre-existing condition, either physical or mental, which was caused by the occurrence of March 31, 1983, or July 26, 1983, or both?
YES X
NO___
2. Do you find that PHI and/or Evangeline Airmotive was at fault, either wholly or in part, under any of the rules of law which I have explained to you for either or both of the March and July occurrences?
YES___
NO X
3. Do you find that AVCO-Lycoming was at fault, either wholly or in part, under any of the rules of law which I have explained to you for either or both of the March and July occurrences?
YES ___
NO X
4. Do you find that Aerospatiale Helicopter Corporation and/or its parent company was at fault, either wholly or in part, under any of the rules of law which I have explained to you for either or both of the March and July occurrences?
YES ___
NO X
5. Do you find that the pilot, John Airington, was at fault, either wholly or in part, under any of the rules of law which I have explained to you for either or both of the March and July occurrences?
YES ___
NO X
6. What amount, if any, do you find will fully and fairly compensate Michael Duhon for the injuries and losses which he sustained in one or both of the occurrences? For any item which you do not feel that an award is due, place a "0" in the blank.

(A) Past and future
 physical pain and
 suffering: $ 17,250.00
 ___________
(B) Past and future mental
 pain and suffering: $ 17,250.00
 ___________
(C) Disability and loss of
 enjoyment of life: $ 0
 ___________
(D) Medical expenses,
 past and future: $ 57,500.00
 ___________

*1276
(E) Loss of earnings and
 loss of earning capacity,
 past and future; $ 20,000.00
 ___________
7. What amount, if any do you award to
Mrs. Duhon for loss of consortium:
 $ 10,000.00
 ___________

8. Do you find that one or more of the defendants acted grossly negligent or showed a willful disregard for the safety of Michael Duhon, which caused his injuries and losses?
YES ___
NO X
If your answer to question 8 above is no, go no further.
After receiving this verdict, the result of three hours of deliberation, the trial judge, not being certain that the jury meant to find damages but no liability, told the jury that he was not sure they intended this result, and sent them back to reconsider. Returning after this reconsideration, which took another 45 minutes, the jury told the court that that was, indeed, their verdict.

WHAT THE TRIAL JUDGE DID
At the conclusion of the presentation of the evidence, before the case was submitted to the jury, all parties moved for directed verdicts on the issues of liability. The trial judge denied the motions of the defendants, but took the plaintiffs' motions under advisement, explaining that he had not been able to look at the voluminous exhibits in evidence, and that he needed to do so before considering the motions. Some two months after the jury verdict, the trial judge directed verdicts against AVCO-Lycoming, the manufacturer, and PHI, the custodian of the aircraft. The court cited La.C.C. art. 2317 as authority for both directed verdicts.
As to Aerospatiale, the trial judge found that there was no evidence the engine that failed was the same engine put there by the manufacturer of the helicopter, and that there was evidence that the engines were frequently moved and replaced when service or repairs were necessary. As to this defendant he denied the motion for a directed verdict.

THE LIABILITY ISSUES

PHI
On this appeal all parties treat the trial judge's directed verdicts, rendered pursuant to La.C.C.P. art. 1810, as judgments notwithstanding the verdict, as provided by La.C.C.P. art. 1811. We will do the same, for it makes no difference what we call them: the standard for determining the propriety of granting a judgment notwithstanding the verdict is the same as used to determine whether a directed verdict should be granted. The standard is: after considering all of the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion, if the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. Rougeau v. Commercial Union Insurance Co., 432 So.2d 1162 (La.App. 3d Cir.1983), writ denied, 437 So.2d 1149 (1983).
As to PHI, however, we do not review by the "reasonable men" standard; rather, we will disregard the trial court's judgment N.O.V., as well as the jury's finding of no negligence, and make an independent determination of whether or not the plaintiff proved that PHI was at fault in accordance with applicable law. The reasons why we feel compelled to disregard both the judge's and the jury's findings in this case are explained as follows.
The liability of PHI is controlled by the general maritime tort law. A helicopter ferrying passengers from shore to an artificial island is engaged in a function traditionally performed by waterborne vessels, and if it is involved in an accident on the high seas, admiralty jurisdiction is invoked. Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). The plaintiffs here are in state court because of the "saving to suitors" clause of 28 U.S.C.A. § 1333. Plaintiffs are in state court seeking a remedy for a wrong, but if the remedy sought under state law alters or conflicts with the maritime or admiralty law which establishes *1277 the substantive rights of the parties, then the federal substantive admiralty or maritime law controls. Hebert v. Diamond M. Co., 367 So.2d 1210 (La.App. 1st Cir.1978).
The question before us is whether the strict liability remedy of La.C.C. art. 2317 is available to the plaintiffs in this admiralty case.
We decide that it is not. Under La.C.C. art. 2317 and the jurisprudence interpreting it, legal fault is imposed on the custodian of a thing for damage caused by a defect in the thing, regardless of any personal negligence by the custodian. King v. Louviere, 543 So.2d 1327 (La.1989). The strict liability or legal fault that arises from La.C.C. art. 2317 is more than a rebuttable presumption of negligence. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). The custodian cannot be absolved from his strict liability even if he proves that he did not know and could not have known of the unreasonable risk to others. Id. at 116.
We have been unable to find anything in the general maritime tort law the same as La.C.C. art. 2317. The warranty of seaworthiness and the liability that attaches to the breach thereof may have some kindred features, but it is applicable only to seamen; there is no implied warranty of seaworthiness extended to passengers. Complaint of Compagnie Generale Transatlantique, 392 F.Supp. 973 (U.S. D.C., Puerto Rico, 1975). Instead, a carrier's duty when transporting passengers requires him to exercise a very high degree of care. Moore-McCormack Lines, Inc. v. Russak, 266 F.2d 573 (9th Cir., 1959). Merely because an accident occurs, however, a carrier does not become liable to a passenger. Katz v. Cie Generale and Transatlantique, 271 F.2d 590 (4th Cir. 1959). A passenger may recover personal injury damages only if he proves the fault or negligence of a carrier. Counts v. Lafayette Crewboats, Inc., 622 F.Supp. 299 (W.D.La.1983).
Since the general maritime tort law requires proof of negligence by a passenger who sues a common carrier, and La. C.C. art. 2317 does not require proof of negligence, there is a substantive conflict affecting the rights of the parties, and the maritime law must prevail.
The evidence concerning the liability of PHI for the March 31 accident was aimed at establishing two theories. First, it was shown that something was wrong with the engine. Second, an effort was made to establish pilot error on the part of Airington in the descent, causing a hard landing. Since the jury made a finding that Airington was not at fault, and this finding is not assigned as error by the plaintiffs on appeal, it is unnecessary to discuss whether PHI might be liable for the negligence of its pilot. This leaves for consideration only whether the failure of the engine was caused by any negligence on the part of PHI, or whether PHI had knowledge of its propensity to fail and flew it in disregard of that knowledge.
The expert Robert K. Phillips reviewed the engine records of this engine from the time it was installed until the time of the accident, and gave testimony that from those records the engine had always performed normally, and that there was "no trend that would have been apparent [or] anything that would indicate something was going to happen."
The expert Semprebon praised PHI's engine maintenance at its shop. The separation of the blade, according to Semprebon, was not due to over stress by the pilot or lack of maintenance on the part of PHI.
The substance of the testimony of these experts was that nothing PHI did in the way of maintenance or operation caused the blade to fail, and there was nothing that it could have done to prevent it. Nor was there any evidence that PHI was aware that such a problem might occur, since it had no prior experience with such failures.
Plaintiffs argue that the bad record of the LTS 101 was so well known throughout the aviation industry that it was gross negligence, to say nothing of ordinary negligence, for PHI to carry passengers in an *1278 aircraft powered by that engine. The testimony does not support a finding that the LTS 101 was considered unsafe in the aviation industry. No witness said so. There was no evidence that it had ever been grounded by the F.A.A. or the N.T.S.B. The engine had some early developmental problems but the evidence is that the PHI people were not aware of this until after March 31, 1983.
Our evaluation of the evidence in this record reveals that no proof, not even of the "smallest" or slightest negligence, exists against PHI. Nothing short of grounding its entire fleet of AS350D aircraft would have exempted PHI from liability, if continuing to fly with the LTS 101 engine on the evidence before us convicts it of negligence rendering it liable under the maritime common carrier laws. On the evidence before us we are not persuaded that PHI by continuing to fly the aircraft acted negligently. The jury, although instructed that PHI's duty was that of ordinary care, reached the same result by finding that PHI was not at fault or negligent. Our disposition of this issue is accordingly consistent with the finding of the jury. We reverse the judgment N.O.V. and reinstate the jury verdict as to this defendant.

AVCO-LYCOMING
The trial judge properly rendered a judgment N.O.V. against AVCO-Lycoming as the manufacturer of a defective product.
As to AVCO-Lycoming the trial judge gave the jury a correct instruction of the law of products liability. Strict products liability is part of the general maritime law. Vickers v. Chiles Drilling Co., 822 F.2d 535 (5th Cir.1987). Louisiana products liability law is for all practical purposes the same as federal maritime products liability law. Forbes v. A & P Boat Rentals, Inc., 689 F.Supp. 625 (E.D.La.1988), p. 629, n. 4. A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be. Halphen v. Johns-Manville Sales Corp., supra, at 114. A manufacturer or supplier who sells a product with a construction or composition flaw is subject to liability without proof that there was any negligence on its part in creating or failing to discover the flaw. Id. at 114.
In this case there is no question that AVCO-Lycoming designed and built the gas producer rotor in the engine. One of the gas producer blades broke causing the engine to fail. The blade broke because of fatigue. Since the experts testified that the stress on the blade could not have been caused by operational or maintenance error, all that is left to explain it is that the blade was defective in either design or construction. Similar blade failures had previously occurred before dampers were installed. AVCO-Lycoming is liable for its defective product. Considering all of the evidence in the case in the light and with all reasonable inferences most favorable to AVCO-Lycoming, we agree with the trial court that the facts and inferences point so strongly and overwhelmingly in favor of the plaintiffs that reasonable men could not arrive at a contrary verdict. The trial court's judgment N.O.V. was proper.

AEROSPATIALE
The trial jury was properly instructed pertaining to the liability of Aerospatiale as manufacturer of the aircraft. The jury found Aerospatiale not liable. The trial judge denied a motion for judgment N.O.V.
As noted by the trial judge in his denial of the motion for judgment N.O.V., and as shown by the documentary evidence, as well as by the testimony, the engine which failed on March 31, 1983, was not the engine in the aircraft at the time of its manufacture or its sale to PHI. The evidence established that the autorotation of March 31 was rendered necessary solely because of the malfunction of the engine, and not because of any defect in the aircraft itself. A manufacturer cannot be liable in a products liability claim where it shows that it did not manufacture or install the component of the product alleged to be defective. Newman v. General Motors Corp., 524 So.2d 207 (La.App. 4th Cir.1988).

*1279 PUNITIVE DAMAGES
Punitive damages are available under the general maritime tort law. In re Complaint of Merry Shipping, Inc., 650 F.2d 622 (5th Cir.1981). Punitive damages may be recovered when a wrongdoer has acted willfully and with gross disregard for the plaintiff's rights. Id. at 625. Punitive damages are disfavored. Creamer v. Porter, 754 F.2d 1311 (5th Cir.1985).
The conduct of AVCO-Lycoming in this case was not such as to justify the imposition of punitive damages.

THE AWARD
At the trial Michael Duhon complained of a herniated cervical disc, damage to the ulnar nerve, a carpal tunnel syndrome, mental pain and suffering, and consequent permanent disability.
The jury awarded him a total of $112,000 in damages. He complains on this appeal that that award was insufficient, particularly the economic loss of only $20,000.
As a meter technician Duhon was earning $13,500 a year in 1983. He testified that during the intervening four years between the accident and the trial he had not been able to work at all. The jury's itemized award to him of only $20,000 in loss of earnings was a clear indication that they did not believe he was disabled to the extent claimed.
There was testimony by plaintiff's treating physicians from which the jury could have concluded that the doctors were not fully informed as to his pre-accident physical condition, and that their attribution of his symptoms to the accident was influenced by an inaccurate medical history. For example, although he told his doctors that his neck pain, headaches, and insomnia did not begin until after March 31, 1983, the evidence at trial revealed that before that date he had seen a chiropractor, Dr. Robert Earl Lee, over 150 times for the same primary complaints as those asserted in this lawsuit.
Mr. Duhon had also been involved in three accidents before March 31, 1983, and was involved in four more between the helicopter incidents and the trial.
The doctors could not say that his elbow and wrist problems were caused by the unscheduled landings, as ulnar neuropathy and carpal tunnel syndromes may be caused by many things other than trauma. Neck surgery was performed in 1984, but the evidence that Mr. Duhon had been seeing a chiropractor for neck pain for five years before the emergency landings virtually eliminated these incidents as the cause of his neck problem, and cast doubt on whether they aggravated it.
Before an appellate court can disturb a trial court's award of damages, the record must clearly show an abuse of discretion. Beard v. Republic-Vanguard Insurance Co., 509 So.2d 561 (La.App. 3d Cir.1987). Credibility determinations are peculiarly the province of the trier of fact. Senegal v. George Theriot's, Inc., 445 So.2d 137 (La.App. 3d Cir.1984), writ denied, 448 So.2d 114 (1984).
After granting the judgment N.O.V. in this case, the trial judge rendered judgment for the plaintiffs in accordance with the quantum of damages assessed by the jury. The trial judge later denied Mr. Duhon's post-trial motions for a new trial and an additur.
After a thorough review of the record pertaining to damages, we find no error in these rulings. The award of only $122,000 in total damages was not an abuse of the jury's discretion.

THE EVIDENTIARY RULINGS

1.
The trial court did not err in excluding from evidence the cross-claims, answer to cross-claims, and other federal court pleadings filed by PHI.
In a federal lawsuit the hull insurer filed pleadings on behalf of PHI against AVCO-Lycoming and Aerospatiale, alleging that the engine in the aircraft on July 26, 1983 (when hull damage from wave action occurred), was defective. The plaintiffs wanted to show this pleading to the jury as a judicial admission showing PHI's knowledge *1280 that the engine was defective, for punitive damage purposes.
Besides being totally irrelevant to the present case, the allegations were not judicial confessions. A judicial confession, as meant by La.C.C. art. 1853, is an express acknowledgment of an adverse fact. Howard Trucking Co. v. Stassi, 485 So.2d 915 (La.1986), cert. denied, 479 U.S. 948, 107 S.Ct. 432, 93 L.Ed.2d 382 (1986). The federal pleadings were not at all an acknowledgment that PHI knew before March 31, 1983, that the LTS 101 engine was defective.

2.
The trial court did not err in excluding from evidence a letter to Frank Lee, PHI's president, from Duhon's employer, Southern Petroleum Laboratories, complaining about the A-Star 350D.
The letter was written on August 1, 1983, after the two autorotation landings in this case. The plaintiffs contend that the letter should have been admitted to impeach Gene Graves, a PHI employee, who testified on cross-examination that Southern Petroleum Laboratories had never expressed any dissatisfaction with the helicopter.
Actually, Gene Graves testified only that he could not himself recall receiving any complaints from Duhon's employer before March of 1983. The letter could not have impeached that testimony and it was properly excluded.

3.
The trial judge recognized plaintiffs' witness, Robert G. Ferry, as an expert helicopter pilot, but refused to qualify him as an expert in helicopter operations and aircraft accident reconstruction. The plaintiffs complain that this was error.
La.C.E. art. 702 provides that a witness qualified as an expert by knowledge, skill, experience, training, or otherwise, may give testimony as an expert. The comments to the article note that broad discretion should be accorded the trial judge in his determination of who should or should not be permitted to testify as an expert.
The witness was extensively examined by both sides as to his qualifications. The trial judge found that he had no experience as an air taxi operator under F.A.A. regulations, and therefore could not qualify as an expert in helicopter operations. He had never attended an aircraft accident investigation school, was not an aircraft mechanic, did not have an engineering degree, had flown the A-Star for only one hour in his career, and he had no manufacturing or design experience in aircraft.
The trial judge did not abuse his discretion in refusing to qualify the witness in these respects. Further, we doubt that the witness' testimony in those areas could have assisted the jury in understanding the evidence or determining any fact in issue.

4.
Plaintiffs wanted to introduce into evidence certain articles concerning the A-Star helicopter and the LTS 101 engine that appeared in the commercial magazines "Rotor & Wing International" and "Aviation Weekly". The articles were critical of the aircraft and the engine.
The stated purpose for the introduction of the articles was for the impeachment of witnesses on cross-examination. The admissibility of the articles was predicated on their being self-authenticating documents under the Louisiana Code of Evidence.
Every witness questioned as to his knowledge of the articles declared his familiarity with the magazines but his inability to recollect whether he had ever read the articles. Thus there was nothing to impeach. Moreover, most were written after the incidents in question.
As to their self-authentication, La. C.E. art. 902(6) provides that extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to printed materials purporting to be newspapers or periodicals. This does not exempt the offerings from passing the usual tests for admissibility. The trial court properly refused to admit the articles in evidence. The only basis for allowing them in evidence would have been to establish the truth of the matters asserted therein. *1281 Their authors were not produced for cross-examination at trial, and thus the articles were no more than inadmissible hearsay. Jennings v. Allstate Insurance Co., 273 So.2d 534 (La.App. 1st Cir.1973).

THE DENIAL OF A NEW TRIAL
Finally, the plaintiffs complain that a new trial should have been granted, and that we should now order one, because of the discovery since the trial of evidence important to the cause, which the parties could not, with due diligence, have obtained before or during the trial. La.C.C.P. art. 1972(2).
They refer to 45 service bulletins and airworthiness directories which allegedly were not produced during discovery despite requests for production. In their brief, plaintiffs state that they obtained these documents after trial by means of a telephone call from the F.A.A.
At the hearing on the motion for a new trial, the defendants responded that they had in fact produced all of these documents. Evidently the trial judge agreed with defendants, because the motion was denied.
Because the alleged incomplete response to discovery took place over two years before trial, it would be next to impossible at this late date to reconstruct events and determine whether the questioned documents were, or were not, made available. The trial judge was in a far better position to evaluate the grounds for this motion than are we, and we find no error in his ruling.
For the foregoing reasons, the judgment of the trial court finding PHI liable to the plaintiffs herein and assessing that defendant with a portion of the costs is reversed. In all other respects the judgment is affirmed. Plaintiffs will pay the costs of this appeal.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.