# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 18-892

**HANOVER INSURANCE COMPANY, ET AL.**

**VERSUS**

**RICELAND AVIATION, INC., ET AL**

**\*\*\*CONSOLIDATED WITH\*\*\***

**UNITED STATES AIRCRAFT INSURANCE GROUP**

**VERSUS**

**GLOBAL TOWER, LLC., ET AL.**

\*\*\*\*\*\*\*\*\*\*

SUPERVISORY WRIT FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. 83-14 C/W 93-14
HONORABLE C. STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN D. SAUNDERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy H. Ezell, and Jonathan W. Perry, Judges.

**WRIT DENIED.**

**Isaac H. Ryan**
**Deutsch Kerrigan, L.L.P.**
**755 Magazine Street**
**New Orleans, LA 70130**
**(504) 593-0718**
**COUNSEL FOR DEFENDANTS/RESPONDENTS:**
     **Global Tower, LLC**
     **GTP Investments, LLC**
     **GTP Infrastructure I, LLC**

**Kendall J. Krielow**
**Block Law Firm, APLC**
**422 East First Street**
**P. O. Box 108**
**Thibodaux, LA 70302**
**(985) 446-0418**
**COUNSEL FOR DEFENDANTS/APPLICANTS:**
     **United States Aircraft Insurance Group**
     **Riceland Aviation, Inc.**

**SAUNDERS, Judge.**

Relators, Riceland Aviation, Inc. (Riceland) and its insurer, United States Aircraft Insurance Group (USAIG), seek writs regarding several evidentiary rulings rendered by the trial court.

## STATEMENT OF THE CASE

On February 15, 2013, a plane owned by Riceland and flown by William "Billy" Precht, Jr. (Precht), crashed while spraying herbicide on a field near Jennings. The plane was a total loss, and Precht died in the crash.

Relators contend that the crash was caused by unmarked guy wires supporting a communications tower, LA-5136, owned by Global Tower, LLC; GTP Infrastructure I, LLC; and GTP Investments, LLC (collectively referred to as "GTP"), which was located adjacent to the field. Relators contend that GTP violated Jefferson Davis Parish Ordinance 5.5-107, which requires that all tower guy wires be marked with TANA markers[1] to enable pilots to identify the location of the wires. GTP contends that the crash occurred because Precht was purposely flying very close to the tower wires in order to cover as much of the field as possible.

Hanover Insurance Company (Hanover), as the subrogee of GTP, filed suit against Relators to recover the $125,830.00 it paid to GTP for damages to the tower caused by the crash. USAIG filed suit against GTP; Telcom Rentals, Inc.; American Tower Corporation; Hanover; and CNA Insurance Company to recover the $560,000.00 in property damages and $9,100.00 in expenses to clean up the debris that it paid to Riceland. The two suits were consolidated.

This case has previously been before this court on Relators' writ application regarding the trial court's ruling that excluded the testimony of their expert in

---

[1] TANA markers are the orange spheres commonly seen on power lines and guy wires.

visibility studies, Paul Kayfetz, and his visibility study. *Hanover Ins. Co. v. Riceland Aviation, Inc.*, 18-783 (La.App. 3 Cir. 10/12/18), *writs denied*, 18-1847 (La. 1/14/19), 260 So.3d 1218 (unpublished writ decision). That writ application was denied. There are no other cases pending in this court that are related to the subject accident; however, there is a case filed by Precht's widow in the United States District Court for the Western District of Louisiana, Lake Charles Division.

Relators filed two motions in limine. The first motion sought the following pre-trial evidentiary determinations: (1) that Relators would be allowed to offer and introduce evidence of GTP's installation of TANA markers after this incident; (2) that any reference to the National Transportation Safety Board's (NTSB) investigation's conclusion and its accident identification number would be excluded; (3) that any reference to Precht's knowledge or familiarity with the tower, guy wires, or the adjacent property would be excluded; and (4) that any reference to trees/vegetation that existed around the guy wire anchors on the date of the accident but are no longer in existence would be excluded. The second motion sought to exclude the testimonies of Colonel J. F. Joseph (Colonel Joseph), GTP's aviation expert, and Robert D. Bartlett (Bartlett), GTP's expert in accident reconstruction.

The motions came for hearing on October 10, 2018. The trial court denied the motion as to numbers (1), (3), and (4) above and denied the motion to exclude the testimony of Colonel Joseph. The motion was granted as to evidence regarding the NTSB's investigation. The argument and ruling on the motion to exclude the testimony of Bartlett was postponed, and this is not included in the writ application.

A written judgment was signed on October 12, 2018. Written reasons for the rulings were issued on October 1, 2018, and October 23, 2018. Relators gave timely notice of their intent to apply for supervisory writs in open court when the rulings

were issued and later in writing. The trial court set a return date of November 24, 2018. This writ application was timely filed in accordance with that order.

GTP filed an opposition to the writ application, and Relators filed a reply.

Trial in this matter is scheduled to begin on Tuesday, June 25, 2019. There are no other hearings scheduled.

## ON THE MERITS

Relators argue that they are entitled to a de novo review because the trial court committed legal errors. However, the correct standard of review is abuse of discretion. "A trial court has great discretion in evidentiary matters, and its decisions regarding motions in limine are reviewed using the abuse of discretion standard." *Sonnier v. State, Dept. of Trans. & Dev.*, 18-73, 18-74, 18-75, p. 4 (La.App. 3 Cir. 6/6/18), 249 So.3d 51, 54.

### *Testimony of Colonel Joseph*

GTP's aviation expert, Colonel Joseph,[2] opines that Precht failed to maintain sufficient wing-tip clearance with the fixed and known communication tower and allowed the aircraft to collide with one of the tower's guy wires. Colonel Joseph further stated that no number of colored spheres or wire sleeves would have prevented the accident because the failure to maintain sufficient clearance was due to Precht's loss of situational awareness and his failure to maintain a proper lookout. Important to Colonel Joseph's conclusion were the facts that Precht had been flying for over ten hours at the time of the crash and that Precht had successfully avoided the guy wires on several past occasions. GTP contends that Colonel Joseph used the same methodology as that employed by the NTSB. According to GTP, Colonel

---

[2] Colonel Joseph is the Deputy Director of Aviation, Chief Pilot, and Director of Flight Services for the Texas Department of Transportation and is a senior member of the Aviation Accident Mishap Board.

Joseph used the established investigation protocols followed by the NTSB, the U.S. Marine Corps, and the Texas Department of Transportation in formulating his opinion.

Relators contend that the trial court erred in finding that Colonel Joseph is qualified to testify as an expert in the field of agriculture aviation.[3] They concede that Colonel Joseph is an accomplished commercial airline pilot but assert that he "lacks the requisite special training, work experience, or practical knowledge in agriculture aviation to opine as an expert on matters unique to agricultural pilots, such as Mr. Precht." (emphasis in original). They contend that Colonel Joseph "has never instructed an agriculture pilot, never evaluated an agriculture pilot, never investigated an agriculture aviation accident, and never made any safety recommendation related to agriculture aviation." Relators also contend that Colonel Joseph used no scientific methodology in reaching his conclusions and that his conclusions were based only on his subjective beliefs and unsupported speculation.

Colonel Joseph reviewed reports issued by the NTSB in its investigation of the subject accident, the depositions of fact witnesses in this case, the reports of other experts rendered in this case, and regulations and maps relative to this case. An expert's opinion may be based upon data and facts not admissible in evidence if they are the type that are reasonably relied upon by experts in the subject field. La.Code Evid. art. 703. "In weighing opposing expert opinions, the trier of fact should consider education and experience of the expert in a particular science or field, reasons given in support of opinion and other evidence which supports or detracts

_____

[3] Relators concede that in its written reasons for ruling, the trial court did not identify the particular field in which Colonel Joseph was qualified. GTP points out that Relators did not attach the transcript of the hearing.

4

therefrom." *Arceneaux v. Daggett*, 594 So.2d 1001, 1005 (La.App. 3 Cir.), *writ denied*, 597 So.2d 1029 (La.1992) (citation omitted).

Relators cite *Duhon v. Petroleum Helicopters, Inc.*, 554 So.2d 1270 (La.App. 3 Cir. 1989), *writ denied*, 559 So.2d 1360 (La.1990),[4] for the proposition that a qualified pilot can be excluded from testifying as an expert in a particular field of aviation. That case involved an accident where a helicopter carrying a meter technician to an offshore platform in the Gulf of Mexico landed in the water. The plaintiff was unhurt in the landing but was pinned by the nose of the helicopter while he was attempting to board the rescue boat. In *Duhon*, this court found no abuse of discretion in the trial court's recognition of the defendants' witness as an expert helicopter pilot and refusal to qualify him as an expert in helicopter operations and aircraft accident reconstruction. The witness had no experience as an air taxi operator and had never attended aircraft accident investigation school.

Relators analogize the field of aviation to the fields of law and medicine which have many different disciplines. According to Relators, one cannot be an expert in all disciplines. We note, however, that "the fact that a medical doctor is not a specialist in a particular field applies only to the weight to be given to such testimony, not to its admissibility." *Hunter v. Bossier Med. Ctr.*, 31,026, p. 14 (La.App. 2 Cir. 9/25/98), 718 So.2d 636, 644. "[W]here medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines." *Pertuit v. Jefferson Parish Hosp. Serv. Dist. No. 2*, 14-752, p. 6 (La.App. 5 Cir. 5/14/15), 170 So.3d 1106, 1110, *writ denied*, 15-1176 (La. 9/18/15), 178 So.3d 152.

---

[4] *Duhon*, 554 So.2d 1270, was overruled on other grounds by *Green v. Industrial Helicopters, Inc.*, 593 So.2d 634 (La.1992).

GTP contends that Precht struck a known and fixed obstruction in broad daylight following numerous repetitive and successful passes and that Relators have failed to show "that the instant accident involves some element unique to agriculture aviation that Colonel Joseph is unqualified to address." For example, GTP points out that Relators have not asserted that there is some characteristic of the subject aircraft, a Dromader M-18, or with the chemicals that Precht was spraying, with which Colonel Joseph must be familiar in order to render an expert opinion. According to GTP, this "case involves a professional pilot performing a repetitive duty and striking a known hazard at a low altitude, which fits squarely within the expertise of Col[onel] Joseph." For example, GTP points out that Colonel Joseph was a Low Altitude Tactics Instructor (LATI) in the Marine Corps who specifically trained pilots in the procedures and strategies for safe operation of aircraft at low altitudes. Colonel Joseph also wrote the Low Level Tactics Manual—KC-130 for the 4th Marine Aircraft Wing. GTP argues that "Colonel Joseph's experience in the round-the-clock pace of military flight operations gives him an excellent real world perspective on the dawn-to-dusk operations engaged in by Precht at the time of the accident[] and the techniques that can be utilized to mitigate the risks posed by fatigue and complacency."

"A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and this includes the determination of how much and what kind of education and/or training adequately qualify an individual as an expert." *Tadlock v. Taylor*, 02-712, p. 4 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 26, *writ denied*, 03-3265 (La. 3/12/04), 869 So.2d 819. "A district court's decision to qualify an expert will not be overturned absent an abuse of discretion." *Chearis v. State ex rel. Dept. of Trans. & Dev.*, 03-680, p. 6 (La. 12/3/03), 861 So.2d 536, 541. An expert's testimony is proper when:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993)], and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id*. at 542, (quoting *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 561 (11th Cir. 1998), *cert. denied*, 528 U.S. 812, 120 S.Ct. 309, and *cert. denied*, 528 U.S. 812, 120 S.Ct. 47 (1999)).

In its written reasons for ruling, the trial court recognized Colonel Joseph as a qualified expert. By Relators' own statement, Colonel Joseph was proffered as an aviation expert. The trial court went on to state that Relators would be allowed to cross examine Colonel Joseph regarding their concerns about his expert testimony.

Relators have retained an agriculture aviation expert, Lemuel Shattuck (Shattuck), who allegedly has over thirty years of experience piloting an aircraft nearly identical to the one involved in the subject accident for the purpose of applying pesticides to fields.

Based on these facts and the cases cited above, we find that Relators have not shown that the trial court abused its discretion in denying its motion in limine to exclude the testimony of Colonel Joseph. Accordingly, the writ application is denied as to this issue.

*Subsequent Remedial Measures*

"In general, remedial measures taken after an incident of negligent conduct are not admissible in evidence because such evidence would discourage people from taking steps to prevent future harm." *Toups v. Sears, Roebuck & Co., Inc.*, 507 So.2d 809, 816 (La.1987).

> The prohibition against evidence of subsequent remedial measures is designed to bring within the scope of the rule any change,

7

repair or precaution *subsequent* to an accident. The prohibition covers only measures taken *after* an event, such as post-accident repairs, installation of safety devices, changes in design, the removal of dangerous conditions, *changes in procedure,* the dismissal of an employee charged with causing an accident, changes in regulations, and changes in labels or instructions.

*N. Assurance Co. v. Louisiana Power & Light Co.*, 580 So.2d 351, 357 (La.1991)

(citations omitted).

Relators contend that when GTP made repairs to the tower after this accident, GTP installed two TANA markers on each the tower's three outermost guy wires. Relators want to introduce photographs of the tower since the markers were installed and a post-construction inspection report from Engineered Tower Solutions, PLLC (ETS), which is dated October 13, 2013, eight months after the accident. The report shows that the locations of guy line wire markers were changed per GTP's instructions. Relators contend that such evidence is admissible under La.Code Evid. art. 407 even though evidence of subsequent remedial measures is generally precluded to prove negligence or culpability. Relators contend that, as allowed by La.Code Evid. art. 407, they will use this evidence to: (1) prove feasibility of precautionary measures since GTP and its experts argue that it was not feasible to install the TANA markers; (2) impeach the credibility of GTP and its experts; and (3) prove that GTP had authority and control over the tower. Relators concede, however, that "GTP's ownership and control of the tower is undisputed."

Relators argue that in taking the position that the presence of the TANA markers on the guy wires would not have prevented the accident, GTP has put the feasibility of putting marker balls directly at issue. GTP, on the other hand, argues that: (1) it has never denied that it owns the tower or that it has custody and garde over it; and (2) it has never asserted that adding marker balls was not feasible in that

8

they were impossible to implement or in that they were unreasonably expensive.[5] Therefore, according to GTP, the only reason that Relators want to introduce this evidence is to imply fault to GTP. GTP's opposition does not discuss the use of the evidence to impeach the credibility of its expert witnesses.

In denying Relators' motion in limine with regard to subsequent remedial measures, the trial court found that none of the purposes for which such evidence could be admitted under La.Code Evid. art. 407 existed in this case. The trial court further found that such evidence would create "an unavoidable and undue risk that the jury would imply culpability for the accident" solely because of the addition of the TANA markers.[6]

Impeachment evidence on the issue of credibility is subject to a determination as to whether its probative value is "substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." La.Code Evid. art. 607(D).

Relators contend that GTP violated Jefferson Davis Parish Ordinance 5.5-107 which requires that all tower guy wires be marked with TANA markers. After the accident, GTP installed the TANA markers. Relators contend that GTP cannot have it both ways in arguing that it did not have to comply with the ordinance but add the marker balls in case it did have to comply. GTP argued that the federal regulations regarding the marking of obstructions to aviation preempted the parish ordinance.

---

[5] "The *feasibility* of performing precautionary measures is not a central issue in this case, nor was it controverted, it is therefore of little relevance." *Burk v. Illinois Cent. Gulf R. Co.*, 529 So.2d 515, 524 (La.App. 1 Cir.), *writ denied*, 532 So.2d 179 (La.1988). The court went on to state that any relevance would be substantially outweighed by the risk that the evidence would be used by the jury to infer that the defendant was negligent. *Id.*

[6] Relators argue that the trial court did not give any analysis of the facts or of the balancing of the prejudicial effect of admitting the evidence against its probative value. While this is true, that the transcript of the hearing is not provided such that it is unknown whether such an analysis was performed by the trial court.

Relators presented no argument to show how this evidence is probative to the issue of GTP's lack of compliance with the ordinance at the time of this accident.

"Evidence of subsequent remedial measures is not considered prejudicial where it relates to the alleged contributory negligence of plaintiff, and where the trial court is careful to point out to the jury that the evidence is not to bear on the general negligence of the defendant." *Scurlock Marine, Inc. v. W.W. Patterson Co.*, 95-528 (E.D. La. 1997) (unreported decision). Relators cite *Thorton v. Nat'l Railroad Passenger Corp.*, 00-2604 (La.App. 4 Cir. 11/14/01), 802 So.2d 816, *writ denied*, 01-3282 (La. 3/15/02), 811 So.2d 907. *Thorton* is of little value in deciding the case at bar because the court in *Thorton* actually found that the actions taken by the defendants in recommending alternative ways to perform the task that the plaintiff was undertaking when he was injured did not constitute subsequent remedial measures. The court in *Thorton* did state that if such actions were considered to be subsequent remedial measures, it agreed with the plaintiff's alternative argument that evidence thereof would have been admissible to attack credibility.

In *Tilden v. Blanca, LLC*, 12-1311 (La.App. 4 Cir. 6/26/13), 119 So.3d 962, the plaintiff slipped and fell in a restaurant and sought to impeach the testimony of the restaurant's owner by introducing evidence that the restaurant placed additional rugs on the floor as a safety measure. The court upheld the trial court's exclusion of the evidence finding that there were no discrepancies between the owner's deposition testimony and his trial testimony. The court further stated that "it saw no evidence to support plaintiff's claim that the placement of additional rugs was an established safety precaution used by Tommy's before [plaintiff]'s fall." *Id*. at

In *Rimkus v. Northwest Colorado Ski Corp.*, 706 F.2d 1060 (10th Cir. 1983), the court upheld the introduction of evidence that the day after the plaintiff's skiing accident, the lodge posted bamboo poles to mark a rock outcropping. It was used to

rebut the ski instructor's testimony that it had never crossed his mind that the plaintiff would not be able to see and avoid the condition. The court recognized that the evidence was received to show that the plaintiff was not guilty of contributory negligence. But the court also noted that "[t]he trial court might well have chosen to exclude the evidence. The judge was fully aware of the problem. He weighed the countervailing contentions with care." *Id*. at 1066.

Colonel Joseph testified that the presence of TANA markers would not have prevented this accident because the loss of situational awareness overcomes any kind of marking. Relators claim that the unmarked guy wires caused and/or contributed to the accident and state that GTP claims that Precht's actions caused the loss of the aircraft such that causation is directly at issue. While these assertions may be true, Relators have not shown how the evidence that the TANA markers were installed after the accident impeaches the testimony of Colonel Joseph or proves that Precht's actions did not cause or contribute to the accident.

For the foregoing reasons, we find that the trial court did not abuse its discretion in ruling that evidence that GTP installed TANA markers after the accident is inadmissible and that the writ application should be denied in this respect.

*Precht's Knowledge of and Familiarity with the Area*

Relators contend that the trial court erred in refusing to exclude any reference to Precht's familiarity with the tower, the tower's guy wires, or the field where the accident occurred. According to Relators, they must prove that the unmarked guy wires presented an unreasonable risk of harm. An unreasonable risk of harm is one that is "of such a nature to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances." *Rose v. Liberty Mut. Fire Ins. Co.*, 15-1184, p. 2 (La.App. 3 Cir. 5/18/16), 192 So.3d 881, 884. If the condition is one that is open and obvious, it

11

does not present an unreasonable risk of harm. *McCoy v. Town of Rosepine*, 15-898 (La.App. 3 Cir. 3/9/16), 187 So.3d 562. "If the complained-of condition ***should be obvious to all,*** then it may not be unreasonably dangerous. Thus, in order to be open and obvious, the risk of harm should be apparent to all who encounter the dangerous condition." *Broussard v. State ex rel. Office of State Bldg.*, 12-1238, p. 17 (La. 4/5/13), 113 So.3d 175, 188 (citations omitted). Based on this, Relators assert that Precht's familiarity with the tower is irrelevant to the question of whether the defect created an unreasonable risk of harm.

GTP asserts that the tower is 500 feet tall, is painted red and white, has flashing lights affixed to it, and has been in existence and marked on aviator charts for decades.

The accident allegedly occurred on Precht's third pass. Relators' own agriculture aviation expert, Shattuck, admitted that Precht "was certainly aware of where that wire was." GTP contends that the evidence is undisputed that Precht knew where the subject guy wires were located.

In denying this motion, the trial court noted that it found "that all towers are a danger to any and all pilots and that the guy wires are apparent and obvious." Realtors contend that these findings by the trial court encroach on the jury's function as fact finder, are fatally flawed, and are inconsistent with *Broussard*, 113 So.3d 175.

*Broussard*, 113 So.3d 175, does not mandate exclusion of evidence regarding Precht's familiarity with the tower or the location of the guy wires. In that case, the plaintiff was a delivery person who injured himself while attempting to maneuver a loaded dolly into an elevator that was misaligned with the lobby floor in a State-owned building. There was testimony from other persons who were aware of the misalignment and evidence of other persons (some of whom worked in the building)

who tripped or fell because they did not notice the misalignment. The court also noted that "[t]here is no dispute that Broussard was aware of the offset after it impeded his initial attempt to push the dolly onto the elevator." *Id.* at 189. While disagreeing with the State's contention that Broussard's awareness of the misalignment should prevent his recovery of damages, the court found that the evidence presented in the case provided support for the jury's conclusion that the misalignment was not open and obvious to all that encountered it, even though it was apparent to the plaintiff.

For these reasons, we find that the trial court did not abuse its discretion in refusing to exclude evidence of Precht's knowledge of the tower and the guy wires. Accordingly, the writ application is denied with respect to this issue.

*Evidence Regarding Trees at the Guy Wire Anchors at the time of the Accident*

Relators also sought to exclude any reference to trees or vegetation at the base of the guy wires at the time of the accident. These trees were removed by GTP following the accident.

Relators contend that evidence of the existence of the trees and whether they were used as topographical features for navigation is irrelevant to the issue of whether the unmarked guy wires presented an unreasonably dangerous condition and that the rationale of *Broussard*, 113 So.3d 175, mandates the exclusion of this evidence.

GTP contends that there was a twenty-five to thirty foot tree growing at the base of the guy wire that was struck by Precht and that Relators' own expert, Shattuck, admitted that trees, shrubs, and other landmarks are typically used by crop-dusting pilots to create a "footprint" of their areas of operations.

The trial court denied this motion for the same reasons it denied the motion to exclude evidence of Precht's familiarity with the tower.

Again, we find that *Broussard*, 113 So.3d 175, does not mandate exclusion of this evidence. In *Broussard*, 113 So.3d at 191 (citations omitted), the court stated: "each case involving an unreasonable risk of harm analysis must be judged under its own unique set of facts and circumstances. . . . [E]ach defect is equally unique, requiring the fact-finder to place more or less weight on different considerations depending on the specific defect under consideration." Moreover, the court went on to state that "the inherently dangerous nature of the plaintiff's activity may persuade the trier-of-fact to conclude a defective logging road, for example, is not unreasonably dangerous." *Id*.

For this reason, we deny the writ application as to this issue, finding no abuse of discretion in the trial court' ruling.

**WRIT DENIED.** We find no abuse of discretion in the trial court's rulings.

14