**Algis K. RIMKUS and Matilde Rimkus, Plaintiffs-Appellees,**

v.

**NORTHWEST COLORADO SKI CORPORATION, Defendant-Appellant.**

**No. 81–1517.**

United States Court of Appeals, Tenth Circuit.

Jan. 17, 1983.

Rehearing Denied June 6, 1983.

Bruce O. Downsbrough, Williams, Trine, Greenstein & Griffith, P.C., Boulder, Colo. (William A. Trine, Williams, Trine, Greenstein & Griffith, P.C., Boulder, Colo., with him on the briefs), for plaintiffs-appellees.

Stephen K. Gerdes, White & Steele, P.C., Denver, Colo. (Glendon L. Laird, White & Steele, P.C., Denver, Colo., with him on the briefs), for defendant-appellant.

Before HOLLOWAY, DOYLE and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a diversity case pertaining to a personal injury which resulted from a ski accident. The case was to a jury, which returned a verdict in favor of the plaintiff and his wife. Mr. Rimkus was the injured one. His award was for injuries suffered. Mrs. Rimkus was awarded damages which flowed from her husband's injuries. The accident occurred on January 15, 1980.

Northwest Colorado Ski Corporation was the defendant at trial. It operates the Steamboat Ski Area, which was determined by the jury to have been 80% negligent for failing to mark an outcropping of rock onto which Mr. Rimkus fell. He was found to have been 20% negligent. The verdict in favor of Mr. Rimkus was $100,160. His wife was awarded $9,200 plus costs and interest, growing out of the fact that she had been required to serve as a nurse for a long period of time.

The above accident took place while Algis K. Rimkus was skiing on what is called the Concentration ski run at Steamboat Springs, Colorado. He had not skied that run previously. Rimkus fell onto a rock outcropping and was injured as a result of the drop-off. The testimony indicated that at the time of the accident snow conditions were fair, the weather was overcast and the lighting conditions were flat.

Rimkus was an expert skier, and the Concentration run is an expert ski run. It is steeply pitched and it is admittedly difficult to groom because of irregularities resulting from its uneven and rocky terrain.

When Rimkus undertook to ski Concentration, there was a man at the top who turned out to be Donald Oakland, a ski area instructor. Rimkus asked Oakland if he could ski with him down Concentration. With Oakland's consent, Rimkus skied down behind and to the side of Oakland. They stopped briefly under the Thunderhead chair lift. While they were stopped an individual on the lift warned them of some rocks below where they were standing. They continued on down with Oakland continuing in the lead. Oakland encountered the rock outcropping at issue. He had been an instructor at Steamboat for some nine years. He avoided the rock without difficulty.

Oakland gave testimony that was somewhat conflicting. He was first called as an adverse witness by the plaintiff. He said that he did notice some kind of a drop or drop-off, and he made a turn to the right, and weaved around that drop-off. He was asked whether it was correct that when he skied down that slope and made that turn around that area, he at no time observed or saw exposed rocks. His answer was, "Not through an angle I was looking at it."

But on cross-examination by Northwest's attorney, Oakland contradicted the testimony just described. When he was called on cross-examination by Northwest's attorney, he was asked, "Have you had occasion where you could observe the visibility of that rock outcropping down there under essentially similar snow conditions that you had that day?" His answer was "Yes." He was asked, "What is your visibility?", and he said, "You can see it from a long distance. At least a couple of hundred feet."

When he was called by Northwest as part of its case, the question was, "And how far were you above the drop-off when you recognized it to be there?", and the answer was, "Probably fifty feet." The next question was, "Did you really then look at that drop-off at any point after that time?", and the answer was, "Not really, no."

He was then cross-examined by plaintiff's attorney, which confirmed the fact that he saw the drop-off when he was about fifty feet from it. He was asked whether he had plenty of time to warn Rimkus of that drop-off, and he said, "At the time I had no thoughts in my mind that he would have any more trouble seeing it than I did, and it never even entered my mind that he would need warning." He was then asked, "And you couldn't see any rocks, you could only see what looked like the snow dropping away there; isn't that right?" His answer was, "I could see the drop—it dropping away, correct. It looked like more than just a roll of a mogul, it looked like a drop-off of a sharp drop-off."

Rimkus testified that he did not see the outcropping or any unusual drop-off as he followed Oakland's general path. He continued, "Suddenly I find myself falling through the air, and then I was heading towards a what looked like a boulder to me, and I soon discovered it was when I hit it."

There is evidence that Rimkus went off one part of the outcropping and landed on another part of the outcropping below. Rimkus also testified that one of the ski patrol who came to assist him said that the rock outcropping definitely should have been marked.

Other witnesses for both sides testified about the visibility of the rock outcropping on that particular day or at other times, but none of the other witnesses had seen the outcropping from the angle from which Rimkus and Oakland approached it on the day of the accident. The ski patrolman

who was quoted by Rimkus as saying the rocks should have been marked denied making that statement.

There are other facts in the record which have significance on this appeal. Included is the evidence as to when natural hazards such as rocks are marked. These kinds of hazards are designated with crossed bamboo poles or wood laths which are placed uphill of the hazard so skiers coming down a run can know that it is necessary to avoid dangers that they might otherwise not see until it was too late. Members of the ski patrol sweep the mountain each morning to mark the hazards they feel skiers might not see. As they patrol the mountain during the day the ski patrol might mark other hazards that appear as snow conditions change due to the weather and the skiers. Similarly, they might mark hazards which had been obvious before, and had thus not been marked, but which had become obscured by falling or drifting snow. The poles and laths generally are taken back down in the late afternoon after the ski area has closed so that snow cats will be free to work the slopes.

During the pretrial preparation, Northwest had stated in response to an interrogatory which was read to the jury as part of Rimkus' case, "As a courtesy to skiers whenever it is possible to mark natural hazards that have appeared due to changing conditions, the areas are marked with bamboo signs, laths, depending upon the need."

But the rocks in this case were not marked in any fashion prior to when Rimkus fell. The trial court, over the objection of Northwest, admitted testimony from an employee of the ski area who said the outcropping was marked the day after the accident "out of respect for Mr. Rimkus." The court also admitted photographs of the outcropping taken some time after the accident. Crossed bamboo poles above the outcropping appear in the photographs. This court ruling is relied on here as a basis for reversal.

The land upon which Concentration is located is part of the Routt National Forest, and is the property of the U.S. Forest Service. Whether the outcropping was visible or could have been seen was one of the principal issues at the trial. It continues to be pressed on appeal. It is, however, an issue of fact.

Rimkus' side of the case tended to show that Northwest was negligent for failing to mark the hidden hazard. The Northwest theory was that the rocks were obvious and did not need marking; since it had no duty to warn of conspicuous natural hazards. It was also Northwest's contention that Rimkus was injured as a result of his negligent failure to see the outcropping and to protect himself.

The contentions of Northwest on this appeal are:

(1) That the trial court erred in permitting evidence of subsequent remedial repairs;

(2) That the trial court erred in refusing to instruct on looking but failing to see; and

(3) That the trial court erred in refusing to instruct regarding defendant's lack of statutory duties.

I.

*Did the court err in receiving evidence which showed that Northwest set up bamboo poles above the rock outcropping after the day of the incident in question?*

In seeking reversal Northwest invokes Rule 407 of the Federal Rules of Evidence. This section provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

■ The above rule codified the generally accepted common law rule which excluded remedial measures which were taken after an accident. The rationale for this principle was that it is an acknowledgement that the failure to have the poles or signs or both was implied negligence. Weinstein, in his Treatise on Evidence, comments on Rule 407 and states:

Rule 407 codifies the almost uniform practice of American courts of excluding evidence of subsequent remedial measures as proof of an admission of fault. The use of the phrase "remedial measures" is designed to bring within the scope of the rule any post-accident change, repair or precaution. The rule was most widely applied in industrial accident cases—before workmen's compensation made negligence irrelevant in most such situations—involving offers of evidence of repairs of the defective condition or installation of safety device on the injury-causing machine. Now it is more commonly applied in manufacturer's liability cases to exclude evidence of subsequent modifications in product design. 2 Weinstein's Evidence, Par. 407[01] (1981) at 407–5 [footnotes omitted].

Weinstein further comments that Rule 407 is broad enough to cover such diverse situations as the discharge of the employee responsible for the accident, the change in company operating procedures or rules, or the removal of a hazardous condition from the premises where the accident took place. The applicability of the subsequent repair doctrine in product liability actions and admissibility of recall letters are discussed in another Section, Par. 407[03].

■ One of the general policies behind Rule 407 is that it encourages desirable repairs by assuring defendants that precautions taken after a mishap are not to be admissible against them as evidence of their past negligence. Moreover, the rule recognizes that such conduct is not in fact an admission since it would also be consistent with an injury due to contributory negligence.

There is testimony and photographs both which were admitted over Northwest's objections. At trial the court admonished both sides to avoid introducing evidence of subsequent repairs without first clearing such evidence with the court. After a bench conference the evidence was admitted. It is to be noted, however, that the trial judge instructed the jury as follows:

Further, ladies and gentlemen, you are instructed that there has been evidence in this case that the area where the accident occurred was later marked by the Defendant. This evidence can be considered not as to any negligence on the part of the Defendant, but only as to the feasibility of marking the area.

Two questions are presented. The first of these is whether the evidence was admissible. If it was not, the next issue is whether Northwest's defense was prejudiced by that evidence or whether the curative instruction given by the court prevented such harm.

We are fully cognizant of Rule 407 of the Rules of Evidence and we are also aware that the policy reasons which support it are well recognized. However, the rule is not without exceptions. The rule itself declares that it does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment.

■ In the case at bar there exists an issue which was introduced by the appellant. We refer to the defense of contributory negligence, which was supported by the witness Oakland, with whom the plaintiff was skiing. He testified that the condition was well recognizable from a distance as far as 200 feet. This sought to establish that the plaintiff here was guilty of contributory negligence in not seeing and avoiding this hazard. It is to be noted that Oakland had been on the scene there at Steamboat Springs for a long period of time, ten years to be exact, and he had been a ski instructor there for nine years. So he was not in the position of a newcomer, and

surely, he must have had prior knowledge of this place.

The plaintiff's position was that this was somewhat of a trap, in that it could not be seen under certain snow conditions from a distance, and that thus, it was all the more of a hazard.

We must view the case as a whole to determine the purpose for admitting the challenged evidence, particularly the conflicting testimony of Oakland as to the ease of seeing the outcropping and the plaintiff's testimony that he had not seen it prior to his fall and injury. Our opinion is that the testimony that was was given regarding the placing of crossed bamboo poles above the outcropping was received not for the purpose of proving the negligence of the defendant, but rather was for the purpose of showing that the plaintiff was not guilty of contributory negligence. The challenged evidence also was admitted for the purpose of undermining the testimony of the witness Oakland that he could see the outcropping for a couple hundred feet.

The trial judge was very cautious about the evidence. At the onset of the trial, the court admonished both sides to avoid introducing evidence of subsequent repairs without first clearing such evidence with the court. Indeed, an argument was had before this was introduced. This was a bench conference, and the evidence was admitted. However, as we noted above, a curative expression was given by the trial court in which he said that this evidence could be considered not as to any negligence on the part of the defendant, but only as to the feasibility of marking the area. This cautionary instruction certainly nullified any tendency that the jury could treat this as an acknowledgement on the part of the de-

fendant-appellant that it recognized that there was an unreasonable hazard present.

In *Knight v. Otis Elevator Co.,* 596 F.2d 84, 91 (3d Cir.1979), it was held that the feasibility of precautions were not controverted and the trial court did not in its ruling reject the evidence there in question.[1] However, here Northwest's position was that it was unnecessary to mark the rocks; not that it was impossible to mark them. The issues that are indicated above surely distinguish this case from *Knight, supra.* Once the defendant introduced this new issue of contributory negligence a new element is presented. The plaintiff must now seek to refute the testimony that he was able to see this condition prior to his going over the edge. Here the plaintiff faced the question of replying to or refuting the evidence of Northwest that the outcropping was an obvious, readily seen condition which the plaintiff as a reasonable person should have observed and avoided. They went so far as to produce evidence from Mr. Oakland that it had never crossed his mind that the plaintiff would have been unable to see and avoid the condition. Having opened this question, appellant is in a poor position to contend that it was reversible error for the court to receive evidence presenting plaintiff's position.

In *Kenny v. Southeastern Pa. Transp. Auth.,* 581 F.2d 351 (3d Cir.1978), *cert. denied,* 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979), the claim of plaintiff was that her rape which occurred on an elevated train platform was, in part, due to the negligent failure of the authority to take adequate precautionary measures such as having sufficient lighting. The Third Circuit upheld the admission of evidence that four light

1. Judge Higginbotham wrote for the panel saying:

    At trial, the appellant sought unsuccessfully to introduce testimony that guards had been placed around the elevator buttons subsequent to her accident. The district court excluded the proffered testimony on the basis of Rules 407 and 403 of the Federal Rules of Evidence. We affirm the district court's ruling. Rule 407 requires that the feasibility of precautionary measures be controverted. At the point in the

trial at which this evidence was offered, however, there was already testimony that such repairs could be made simply, easily and inexpensively. Thus, additional evidence on this issue would have been cumulative at best and prejudicial at worst. It does not appear from a review of the record that the district court abused its discretion under Rule 403 in excluding evidence of subsequent repairs. 596 F.2d at 91–92 [footnotes omitted].

bulbs had been replaced soon after the incident and that a new fixture had been installed four days after the assault. The reasoning was that the evidence showed the need to replace protective devices already in place and in use rather than the showing of the need for entirely new precautions. The evidence was also held admissible because it "bore directly on the inference that since the lighting was checked on a daily basis, it was adequate at the time the incident occurred." *Id.,* at 356.

The case of *Oberst v. International Harvester Co., Inc.,* 640 F.2d 863, 868–69 (7th Cir.1980), involved an impeachment situation. The separate opinion of Swygert, J. states that plaintiff should have been allowed to impeach defendant's testimony about a design decision in which there was evidence of subsequent repairs; apparently the decision was primarily economic.

Rimkus was allowed to show that Northwest marked the rocks the day after the accident. Inconspicuous hazards on the slopes were marked every morning. The fact that the rocks in issue were unmarked at the time of the accident tended to raise the inference that they must have been clearly visible on the day of the accident. To deprive Rimkus of an opportunity to rebut this inference would have been unfair. It threatened to place Rimkus in the position of contending with unrefuted contributory negligence.

The trial court was careful to point out to the jury that the evidence was received for a limited purpose and was not to bear on the general negligence of the defendant at all. In allowing the plaintiff to present evidence which related to the evidence offered by Northwest the court was making a natural trial ruling; one which fell short of constituting reversible error. *See Bauman v. Volkswagenwerk Artiengesellschaft,* 621 F.2d 230, 232–33 (6th Cir.1980). In *Bauman* the trial court's refusal to give a limiting instruction as to product redesign required reversal because it was the only evidence to support the jury's finding of negligent design. *Cf. Lebrecht v. Bethlehem Steel Corp.,* 402 F.2d 585, 592 (2d Cir.1968), where

there was an admission of a photograph where the court instructed the jury to ignore planking in the photo that had been subsequently placed over the hole through which plaintiff fell and where the issue was not whether defendant should have covered the hole.

■ Rule 407 prohibits the admission of evidence of subsequent repairs when that evidence is introduced for the purpose of proving negligence of the defendant. Where it relates to the alleged contributory negligence of plaintiff it should not be considered prejudicial. Indeed, where any other purpose exists the jury should be allowed to hear and consider the evidence. Advisory Committee's Notes, quoted in 2 Wigmore on Evidence, 283(4) (1979) at 181. Cases such as the one at bar present a recognized difficulty in applying Rule 407: "[T]he feasibility of a precaution may bear on whether it was negligent not to have taken the precaution; thus negligence and feasibility are often not distinct issues." *Weinstein, supra,* at 407–18.

The trial court might well have chosen to exclude the evidence. The judge was fully aware of the problem. He weighed the countervailing contentions with care. He made it plain that it was to be considered only with respect to other issues besides the possible negligence of the defendant. Thus, we see no basis for finding and concluding that the acceptance of the evidence for a limited purpose was erroneous.

## II.

*Was it error for the trial court to refuse to give the instruction regarding looking and failing to see?*

■ The instruction tendered reads as follows:

> To look in a manner so as to fail to see what must have been plainly visible is to look without a reasonable degree of care and is of no more effect than not to have looked at all.

This court has addressed the issue in an earlier ski accident case which involved a collision between two skiers, *Ninio v. Hight,* 385 F.2d 350 (10th Cir.1967). In *Ninio* this court held that the trial court erred by not

giving an instruction similar to the one quoted above. But in *Ninio* the day was shown to have been clear and the downhill view was unobstructed. There was a dispute before the jury as to whether the defendant was prevented from seeing what he would have seen had he looked downhill. Because it was plaintiff's theory that defendant was negligent for failing to see what he reasonably could and should have seen, plaintiff was entitled to have the jury consider that question guided by Colorado's "rule of the road." As we view it the majority opinion in *Ninio* is not applicable here because in this case there is a genuine dispute about whether this condition could have been seen by a reasonable man and the jury has resolved it in favor of the plaintiff.

It is to be noted that although the court did not give the proffered instruction above, it did give the instruction below which followed Colorado's Ski Safety and Liability Act, Colo.Rev.Stat. 33–44–101 et seq. (1973). The court instructed the jury in the following manner:

A violation of any requirement of this article shall . . . constitute negligence on the part of the person violating such requirements.

.  .  .  .  .

Each skier has the duty to maintain control of his speed and course at all times when skiing and to maintain the proper lookout so as to be able to avoid other skiers and objectes [sic].

However, the primary duty shall be on the person skiing downhill to avoid collision with any other person or object below him.

It's presumed unless shown to the contrary by a preponderance of the evidence that the responsibility for collisions by skiers with any person, natural object or manmade structure is solely that of the skier or skiers involved and not that of the ski area operator.

Under the circumstances it would have been error for the court to have given the instruction that was tendered because it would have given the jury the impression that it was an accepted fact that the hazard was visible to the plaintiff and that he had not looked with care. There surely was very little, if anything, in the evidence that would support the giving of the instruction. It is our conclusion that the instruction which was given by the trial court here was adequate to satisfy the purpose. This instruction is more to the point in the case that is before us than the instruction that was refused in *Ninio*.

We have considered the argument of Northwest as to the applicability of the instruction under the Colorado Ski Safety and Liability Act with respect to the marking of natural conditions on slopes. The statute, Colo.Rev.Stat. 33–44–107(7) (1973), requires ski areas to mark man-made obstacles on slopes that are not clearly visible in conditions of ordinary visibility. Thus the essence of the presentation here is that the court should have told the jury what the law does not require. We do not see that this court committed any error in refusing to give such an instruction.

It follows from the foregoing that the judgment of the district court should be and the same is hereby affirmed.