19CA2124 Langley v Van Eaton 01-20-2022 COLORADO COURT OF APPEALS Court of Appeals No. 19CA2124 City and County of Denver District Court No. 17CV34847 Honorable Martin F. Egelhoff, Judge James Langley, Plaintiff-Appellee, v. Heidi Van Eaton and Team Industrial Services, Inc., Defendants-Appellants. JUDGMENT AFFIRMED, ORDER VACATED, AND CASE REMANDED WITH DIRECTIONS Division VII Opinion by JUDGE GROVE Navarro and Pawar, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 20, 2022 Bachus & Schanker LLC, J. Kyle Bachus, Denver, Colorado, for Plaintiff-
Appellee Hall & Evans, L.L.C., Malcom S. Mead, Kenneth H. Lyman, Bryan Gogarty, Denver, Colorado, for Defendants-Appellants 
1 ¶ 1 Plaintiff, James Langley, was injured when defendant, Heidi Van Eaton, negligently ran into him in a pickup truck while Langley was bicycling on the road. The truck was owned by Van Eaton’s employer. ¶ 2 Van Eaton and her employer, Team Industrial Services, Inc. (collectively, Van Eaton), appeal the judgment entered on the jury’s verdict finding them liable for ninety percent of Langley’s damages and allocating the remaining ten percent to Northern Colorado Traffic Control (NCTC), a company that designed the traffic flow in the construction zone where the collision occurred. We affirm the judgment but remand the case for recalculation of postjudgment interest. I. Background ¶ 3 Van Eaton collided with Langley as he lawfully rode his bicycle through a construction zone adjacent to a freeway off-ramp. Van Eaton, who was exiting from the freeway in a pickup truck, failed to yield as required by two signs at the end of the off-ramp and collided with Langley. Langley sustained serious injuries. ¶ 4 Langley sued Van Eaton and her employer. Van Eaton then designated NCTC as a nonparty at fault. In response, Langley 
2 amended his complaint to include claims against both NCTC and Lawrence Construction (collectively, NCTC). Before trial, Van Eaton admitted that she was negligent, leaving the amount of damages and the allocation of comparative fault between herself, NCTC, and Langley as the only issues for the jury to decide. ¶ 5 Also before trial, Langley entered into a written high-low agreement with NCTC, in which NCTC agreed that, notwithstanding the jury’s verdict, it would pay Langley no less than $125,000 and no more than $350,000. Neither party disclosed the agreement before trial, either to the trial court or to Van Eaton. And because it was not disclosed to Van Eaton or to the court, the jury was not made aware of it either. ¶ 6 In his opening statement, Langley’s attorney argued that both Van Eaton and NCTC were at fault. However, Langley presented no evidence of NCTC’s fault for his injuries except for showing a videotaped deposition of Van Eaton, during which she blamed NCTC for its poor design of the interchange. Accordingly, once Langley rested his case-in-chief, NCTC moved for a directed verdict. Because Langley had presented no substantive evidence against it, the trial court granted the motion, and NCTC became a nonparty. 
3 ¶ 7 This order prompted Van Eaton to move for a mistrial. Van Eaton’s attorney argued that he had been “sandbagged” and expressed concern that Langley would now switch tactics and argue that NCTC bore no responsibility for the crash so as to minimize the possibility that the jury would allocate NCTC a substantial portion of the comparative fault. During a lengthy colloquy with the court and counsel, Van Eaton’s attorney also told the court that he had learned that Langley and NCTC had reached some sort of agreement, and, although he had been unable to learn its details, he suspected that it was collusive. As counsel put it: “[T]his is a soft presentation and basically a rollover on [Langley’s] claims against [NCTC], because [Langley] want[s] to argue next that there has been a judicial determination of insufficient evidence with regard to [NCTC’s] liability.” ¶ 8 The trial court denied Van Eaton’s motion for a mistrial, and instead ruled that Langley had already made “a clear judicial admission with respect to [his] allegations that [NCTC was] negligent.” The court thus prohibited Langley’s attorney from arguing that NCTC did not bear any causal fault for the accident. Langley complied with this order, and at the end of the trial the jury 
4 found that Van Eaton, NCTC, and Langley were all negligent. It apportioned ninety percent of the award to Van Eaton and ten percent to NCTC. The jury apportioned zero percent of the award to Langley because, in response to an interrogatory on the verdict form, it found that Langley’s negligence was not a cause of his own claimed damages or losses. ¶ 9 After the verdict, Van Eaton filed a motion to depose counsel for NCTC “concerning the existence of a settlement agreement between [NCTC] and [Langley].” At the same time, Van Eaton filed a motion for a new trial in which she argued that she had been prejudiced by the other parties’ failure to promptly disclose the high-low agreement and by the trial court’s corresponding failure to instruct the jury as to the agreement’s existence, consistent with Greenemeier v. Spencer, 719 P.2d 710 (Colo. 1986). In response, Langley disclosed the high-low agreement to Van Eaton. Later, the court issued an order denying the motion for a new trial. With respect to the nondisclosure of the high-low agreement, the court pointed out that it could not have instructed the jury about its existence because it had no idea that the agreement existed and Van Eaton never requested a Greenemeier instruction. 
5 II. Nondisclosure of Settlement Agreement ¶ 10 Van Eaton contends that she is entitled to a new trial because neither Langley nor NCTC timely disclosed their high-low agreement to her or to the court, as she contends was required by our supreme court’s holding in Greenemeier. While we agree that the agreement should have been disclosed, we conclude that reversal is not required because Van Eaton cannot establish that she was prejudiced by the lack of disclosure. A. Preservation ¶ 11 Van Eaton’s argument on appeal concerning the high-low agreement is best understood as presenting two independent, but related, contentions. She first argues that the trial court erred by failing to provide a Greenemeier instruction to the jury. Second, she maintains that the trial court erroneously denied her motion for a new trial, which was based in part on her argument that she was prejudiced by Langley’s and NCTC’s failure to disclose the high-low agreement. ¶ 12 Langley urges us to deem Van Eaton’s arguments unpreserved and thus unreviewable. We agree in part. Because counsel for Van Eaton never asked the trial court to provide a Greenemeier 
6 instruction nor asked the court to inquire further once he inferred that some sort of agreement had been reached, the court had no information upon which it could have based a Greenemeier instruction. See C.R.C.P. 51; McLaughlin v. BNSF Ry. Co., 2012 COA 92, ¶ 21 n.2 (declining to review instruction-related contention of error because the party “did not request such an instruction in the district court, and therefore failed to preserve the issue for review”). We therefore are not in a position to review the trial court’s failure to instruct the jury of the existence of the high-low agreement. ¶ 13 On the other hand, the propriety of Langley’s nondisclosure of the high-low agreement is properly before us insofar as it formed the basis for Van Eaton’s motion for a new trial. Citing C.R.C.P. 59(d)(1), Van Eaton contends that the failure of Langley and NCTC to disclose the high-low agreement was an “irregularity in the proceedings” that deprived her of a fair trial. Because this issue is preserved, we examine Van Eaton’s contentions through the lens of her C.R.C.P. 59 motion. 
7 B. Standard of Review ¶ 14 We review a trial court’s ruling on a motion for new trial under C.R.C.P. 59(a) for an abuse of discretion. Buckley Powder Co. v. State, 70 P.3d 547, 564 (Colo. App. 2002). A trial court abuses its discretion when its actions are manifestly arbitrary, unreasonable, or unfair, or are based on an erroneous understanding or application of the law. Sch. Dist. No. 12 v. Sec. Life of Denver Ins. Co., 185 P.3d 781, 786-87 (Colo. 2008). C. Analysis ¶ 15 The precise issue before us is whether the trial court erred when it denied Van Eaton’s motion for a new trial because Langley and NCTC did not disclose their high-low agreement, thus depriving her of the opportunity to request a Greenemeier instruction. We first consider whether a high-low agreement is the type of settlement agreement contemplated in Greenemeier. After concluding that it is and observing that it should have been promptly disclosed to the court and opposing parties, we hold that, nonetheless, Van Eaton was not prejudiced by Langley’s nondisclosure, and is therefore not entitled to a new trial. 
8 1. High-Low Agreements ¶ 16 At the outset, we consider whether the high-low agreement is the type of settlement agreement that should have been disclosed to the court and any parties not made part of the settlement. Langley argues that disclosure was unnecessary because a high-low agreement is a “conditional settlement” that, at least in this case, did not excuse NCTC from participating in the trial, and in fact substantially incentivized it to do so by providing for a large difference between the agreement’s $125,000 and $350,000 bookends. ¶ 17 A number of other jurisdictions have considered this question and have held — universally, as far as we can tell— that high-low settlement agreements should be disclosed to courts and other litigants. See, e.g., Monti v. Wenkert, 947 A.2d 261, 276 (Conn. 2008) (“All verdict contingent settlement agreements promptly must be disclosed to the court and any nonsettling defendants.”); In re Eighth Jud. Dist. Asbestos Litig., 872 N.E.2d 232, 236 (N.Y. 2007) (“To ensure that all parties to a litigation are treated fairly, we hold that whenever a plaintiff and a defendant enter into a high-low agreement in a multi-defendant action which requires the agreeing 
9 defendant to remain a party to the litigation, the parties must disclose the existence of that agreement and its terms to the court and the nonagreeing defendant(s).”); Corn Exch. Bank v. Tri-State Livestock Auction Co., 368 N.W.2d 596, 599 (S.D. 1995) (holding that the disclosure of a high-low agreement to the court and nonagreeing defendants is “imperative” because “without prior disclosure the trial court never arrives at the question of whether the agreement should be revealed to the jury”); Ratterree v. Bartlett, 707 P.2d 1063, 1076 (Kan. 1985) (“When a settlement agreement is entered into between the plaintiff and one or more, but not all, alleged defendant tortfeasors, the parties entering into such agreement shall promptly inform the court in which the action is pending and the other parties to the action of the existence of the agreement and its terms.”). ¶ 18 Although it addressed a somewhat different question, Greenemeier is consistent with this reasoning. In fact, in that case, our supreme court went one step further than many states have done by holding that “the fact of settlement, but not the amount paid, should be brought to the jury’s attention, absent special circumstances.” 719 P.2d at 714 (emphasis added). Under 
10 Greenemeier then, there is a presumption that juries should be instructed concerning a codefendant’s settlement. And it flows from that presumption that the court and other parties will be made aware of the settlement in the first place. After all, a court cannot formulate and provide an instruction about the settlement if it is unaware that it exists. Thus, the existence and terms of the high-
low agreement should have been promptly disclosed to Van Eaton and the court. 2. Prejudice ¶ 19 We turn next to whether Van Eaton was prejudiced by the nondisclosure such that a new trial is warranted. ¶ 20 Most courts to have considered the question have held that while disclosure is mandatory, failure to comply with that requirement will lead to reversal only if the lack of disclosure prejudices the nonagreeing party. See, e.g., Monti, 947 A.2d at 277 (holding that nonagreeing defendant was not prejudiced by nondisclosure because “the agreement did not change the adversarial alignment of the parties”); Ryals v. Hall-Lane Moving & Storage Co., 468 S.E.2d 69, 72 (N.C. Ct. App. 1996) (holding that the nonagreeing party was “not prejudiced by ignorance until mid-
11 trial of a settlement agreement between plaintiff and the co-
defendants such that exclusion of evidence of that agreement constituted reversible error”). We conclude that this approach is consistent with Greenemeier, which held that the failure to disclose a settlement agreement to the jury is not reversible error unless the lack of disclosure prejudices the nonsettling party. 719 P.2d at 717. We find no prejudice here. ¶ 21 To be sure, Van Eaton was apparently not expecting Langley’s eleventh-hour change in trial strategy, and counsel for NCTC and Langley both had ample opportunity to disclose the existence of the high-low agreement to Van Eaton or the court.
1 But a party seeking a new trial faces a high bar. The motion should be denied “where the error ‘did not prejudice or harm the party seeking a new trial, or where the trial resulted in substantial justice.’” McLaughlin, ¶ 17 (citation omitted); see also Greenemeier, 719 P.2d at 717. 1 While we conclude that counsel should have disclosed the agreement, we recognize that there is arguably some fault on both sides here. Van Eaton’s last-minute disclosure that she was not going to contest negligence substantially changed the trial calculus for Langley’s counsel and appears to have prompted efforts to ensure at least a minimal recovery in the event that the jury allocated fault unfavorably with respect to Langley. 
12 ¶ 22 We conclude that the trial court did not abuse its discretion by denying Van Eaton’s motion for a new trial because (1) even if it were appropriate,
2 a Greenemeier instruction would not have avoided the specific prejudice Van Eaton alleges on appeal; and (2) the agreement did not change the adversarial posture of the parties. a. Greenemeier Instruction ¶ 23 Van Eaton contends that because the jurors understood that the claims against NCTC were dismissed, but did not know why, they would naturally infer that there was little or no evidence to support those claims and thus allocate minimal fault to NCTC. She asserts that, had she known of the high-low agreement, she “would have asked the court to tell the jury that the claims against NCTC had been dismissed because Plaintiff and NCTC had reached a settlement — in other words, a Greenemeier instruction.” 2 The propriety of a Greenemeier instruction is an issue distinct from the question whether the agreement should have been disclosed to the parties and the court. We do not consider whether a Greenemeier instruction would have been appropriate here because we conclude that Van Eaton was not prejudiced by its absence. Thus, any error was harmless. 
13 ¶ 24 The trial court, however, did not grant NCTC’s motion for a directed verdict because “Plaintiff and NCTC had reached a settlement.” Instead, the court granted the motion because Langley failed to carry his burden of proof against NCTC during his case-in-
chief. While Van Eaton speculates that Langley’s decision not to do so was the result of collusion, jury instructions must be tied to evidence in the record. See Bedor v. Johnson, 2013 CO 4, ¶ 50 (“A trial court has a duty to properly instruct the jury on law applicable to the case if there is evidence in the record to support it.”). ¶ 25 Moreover, the record tends to undermine Van Eaton’s claim of manipulation. The high-low agreement itself, for example, stated that the parties entered into the agreement “in an effort to protect their respective interests and not for any other purpose or collusive effect as to the remaining parties.” And while the self-serving nature of that statement may make it less persuasive, the high-low agreement backed it up by establishing a large gap — $225,000 — between its two extremes. This incentivized both sides to make their respective cases, see Asbestos Litig., 872 N.E.2d at 234 n.2 (“[T]he narrower the range, the more likely it seems that the parties’ true motive for entering into a high-low agreement is to gain a 
14 tactical advantage at the expense of the nonagreeing defendant.”), as was apparent from the appropriately adversarial posture that NCTC took in its opening statement and while conducting cross-
examination. See Gen. Motors Corp. v. Lahocki, 410 A.2d 1039, 1044-45 (Md. 1980) (relying on settling defendant’s failure to vigorously cross-examine plaintiff’s expert as support for “GM’s assertion that the [high-low] agreement effected a change in its relationship as a co-defendant”). ¶ 26 Finally, the jury was instructed “to consider only the evidence received at trial” and not to “be influenced by sympathy, bias, or prejudice for or against any party in this case.” Because we presume a jury will follow the trial court’s instructions, see Rego Co. v. McKown-Katy, 801 P.2d 536, 539 (Colo. 1990), we presume that its verdict was based on the evidence presented at trial, and not influenced by the dismissal of NCTC. b. Burden of Proof ¶ 27 Van Eaton also contends that when NCTC was dismissed mid-
trial, the burden of proof shifted. As she frames the argument, at the beginning of the trial, Langley had the burden to prove that NCTC was liable, but once NCTC became a nonparty, the burden of 
15 proof shifted to Van Eaton, who was then tasked with proving nonparty fault. Because this happened mid-trial, Van Eaton contends, it was too late to subpoena additional witnesses, which prejudiced her. ¶ 28 What this argument overlooks is that Van Eaton’s strategy all along — and particularly after she admitted her own negligence at the outset of trial — was to shift blame away from herself and toward both Langley and NCTC. Van Eaton originally designated NCTC as a nonparty at fault. At trial, she presented evidence that NCTC bore blame for the accident. And during closing argument, her attorney argued that NCTC was liable because the traffic plan for the construction zone was designed incorrectly and did not take safety into account. ¶ 29 Therefore, it is not clear how Van Eaton was prejudiced by NCTC’s dismissal and shift to nonparty status. She could have asked for a continuance or other leeway from the court to subpoena additional witnesses, but she did not. Her trial strategy — which included presentation of an expert witness who opined that NCTC was at fault for the accident — remained largely the same, and she continued to place blame for the accident on Langley and NCTC. 
16 ¶ 30 In sum, under the circumstances here, we cannot find that Van Eaton was prejudiced by the nondisclosure of the high-low settlement agreement. In accordance with C.R.C.P. 61, the trial court thus did not abuse its discretion by disregarding a defect in the proceedings because it did not affect Van Eaton’s substantial rights. Therefore, the trial court did not err by denying Van Eaton’s motion for a new trial. III. Exclusion of Expert in Safe Bicycling Practices ¶ 31 At trial, Van Eaton called Jeffrey Broker, Ph.D., to testify about safe bicycling practices. After Van Eaton attempted to qualify Broker as an expert, Langley objected. The court then held a lengthy discussion with both parties as to the admissibility of the testimony, after which it concluded that the “testimony that was going to be offered by the witness wasn’t a proper subject of expert testimony.” ¶ 32 Van Eaton contends that the trial court erred by ruling that (1) Broker was not qualified; (2) if Langley’s actions were legal, they could not be considered unreasonable; and (3) Broker’s testimony would not be necessary or helpful to the jury. We disagree. 
17 A. Standard of Review ¶ 33 We review the district’s court decision to exclude expert testimony for an abuse of discretion. Core-Mark Midcontinent, Inc. v. Sonitrol Corp., 2012 COA 120, ¶ 29; see also People v. Fasy, 829 P.2d 1314, 1317-18 (Colo. 1992) (trial courts have broad discretion to determine the admissibility of expert testimony). A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or is based on application of an erroneous legal standard. Core-Mark Midcontinent Inc. v. Sonitrol Corp., 2016 COA 22, ¶ 49; Core-Mark, 2012 COA 120, ¶ 29. ¶ 34 CRE 702 provides that “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.” It thus establishes a two-part approach to admissibility. A court must first determine whether the proffered expert testimony will be helpful to the trier of fact in the understanding of evidence or resolution of a fact at issue in the case. See Melville v. Southward, 791 P.2d 383, 
18 387 (Colo. 1990). Second, the court must determine whether the witness is qualified to give the proposed testimony. Id. ¶ 35 Expert testimony is helpful to the trier of fact if it explains a relevant matter that is outside the understanding of the ordinary juror. People v. Williams, 790 P.2d 796, 798 (Colo. 1990); see also Gerrity Oil & Gas Corp. v. Magness, 946 P.2d 913, 932 (Colo. 1997) (expert testimony is required to establish the standard of care only if the standard is not within the “common knowledge and experience of ordinary persons”); 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 7:9, at 759 (4th ed. 2013) (The helpfulness standard is satisfied “if the subject is technical and lies beyond common experience, and [with] experts who are versed in fields of specialized or technical knowledge that are well beyond the common experience of lay people.”); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein’s Federal Evidence § 702.03[2][a], at 702-42 (Mark S. Brodin ed., 2d ed. 2015) (“Expert testimony is generally not permitted concerning factual issues that are within the knowledge and experience of ordinary lay people, because it would not help the trier of fact to understand the evidence or determine a fact in issue. The trier of fact is, under those circumstances, fully 
19 capable of understanding the evidence and deciding the issues through the use of its common knowledge and common sense.”). Determining whether particular expert testimony meets that standard involves an inquiry as to “whether the untrained [layperson] would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved.” Williams, 790 P.2d at 798 (quoting Fed. R. Evid. 702 advisory committee’s note to 1972 proposed rule). B. Analysis ¶ 36 Van Eaton contends that the trial court erred when it found Broker to be unqualified to testify and also when it determined that Broker could not opine that Langley was acting unreasonably even though he was following the law. Having examined the entire colloquy concerning Van Eaton’s attempt to qualify Broker as an expert, including the pinpoint citations that Van Eaton provides, we do not agree that the trial court made either of these rulings so we decline to address them. ¶ 37 Instead, the trial court based its ruling on Van Eaton’s third contention of error and concluded that Broker’s prospective 
20 testimony would have been neither necessary nor helpful for the jury. Broker was planning to testify that Langley could have been safer if had he worn brighter clothing, had not entered the intersection immediately after the light turned green, and had made eye contact with Van Eaton before entering the intersection. After discussing this prospective testimony with the parties, the trial court raised the concern that the topics Broker planned to cover were ones that the jurors were capable of understanding using common sense and their own life experiences. The court gave both parties an opportunity to respond to this concern, and the following colloquy occurred: THE COURT: But this just doesn’t strike me as a proper area for expert testimony. So if there’s something based upon his expertise that’s beyond the understanding of an ordinary juror, then let’s hear it, but . . . what I’m hearing . . . doesn’t strike me as being a proper subject for expert testimony. VAN EATON’S ATTORNEY: I’d like an opportunity to submit a supplemental offer of proof, probably his report, maybe his deposition, just so we have a record on that. THE COURT: Well, now is your chance to convince me that he’s got something relevant and admissible to say. 
21 ¶ 38 Van Eaton’s attorney declined to articulate any additional reasons for the admissibility of Broker’s testimony, did not ask for a recess, and did not ask for an opportunity to consult with Broker. The trial court continued: “And I’m talking to the Court of Appeals right now saying that I can only rule on what I have. Okay? So let’s move on.” ¶ 39 The trial court gave Van Eaton ample opportunity to explain why Broker’s opinions were appropriately expert testimony instead of issues that lay jurors could be expected to understand based on their own common sense and life experiences. Yet Van Eaton declined to do so. We conclude that the trial court appropriately exercised its discretion when it concluded that the three topics Van Eaton articulated that Broker would opine on — conspicuous clothing, timing the light, and eye contact — could reasonably be understood through common knowledge and experience of ordinary persons; thus expert testimony was not required. See 4 Weinstein & Berger, § 702.03[2][a], at 702-42. ¶ 40 Van Eaton also contends that Broker would have offered other opinions that were beyond what the jury could have determined through common sense. For example, Broker could have discussed 
22 his line-of-sight analysis or how Langley could have taken a safer route with a dedicated bicycle lane. But as we have already noted, Van Eaton did not identify either of these opinions as subjects of Broker’s expertise, even when the trial court made clear that it was looking for more. We therefore decline to address them. See O’Connell v. Biomet, Inc., 250 P.3d 1278, 1282 (Colo. App. 2010) (“Arguments never presented to, considered by, or ruled upon by a trial court may not be raised for the first time on appeal.”). Accordingly, we conclude that the trial court did not abuse its discretion when it ruled that Broker could not testify. IV. Jury Instructions ¶ 41 Next, Van Eaton contends that the trial court erred by failing to instruct the jury on both a bicyclist’s duty of care and assumption of the risk. We are not persuaded. A. Preservation and Standard of Review ¶ 42 Because Van Eaton tendered instructions to the court on both a bicyclist’s duty of care and assumption of the risk, both issues are preserved for our review. ¶ 43 It is within the trial court’s discretion to determine the form and style of jury instructions. Harris Grp., Inc. v. Robinson, 209 
23 P.3d 1188, 1195 (Colo. App. 2009) (citing Williams v. Chrysler Ins. Co., 928 P.2d 1375, 1377 (Colo. App. 1996)). “We will not overturn such a determination absent a showing of an abuse of that discretion.” Id. (citing Williams, 928 P.2d at 1377). “A court’s ruling on jury instructions is an abuse of discretion only when the ruling is manifestly arbitrary, unreasonable, or unfair.” Id. (citing Williams, 928 P.2d at 1377). ¶ 44 A court erroneously instructs the jury when the instruction at issue misleads or confuses the jury. Id. However, a court’s erroneous instruction is reversible only when it prejudices a party’s substantial rights. Id. If a jury probably would have decided a case differently if given a correct instruction, then the error is reversible. Id. (citing Webb v. Dessert Seed Co., 718 P.2d 1057, 1066-67 (Colo. 1986)). B. Duty of Care ¶ 45 Van Eaton provided the trial court with the following stock instruction: “Although a bicycle operator may have the right of way, the bicycle operator must exercise reasonable care considering the existing conditions.” CJI-Civ. 11:3 (2021). 
24 ¶ 46 She first contends that because C.R.C.P. 51.1 says that the court “shall use” the instructions from the Colorado Jury Instructions “as are applicable to the evidence and the prevailing law,” the court erred by not using this particular instruction because it was most applicable to the facts of the case. We reject this argument because it is settled that, if the other instructions adequately inform the jury of the applicable law, a trial court does not err in refusing a legally correct tendered instruction. Vista Resorts, Inc. v. Goodyear Tire & Rubber Co., 117 P.3d 60, 70 (Colo. App. 2004). ¶ 47 The trial court declined to use the tendered bicycle-specific instruction because it found that the concept that the instruction explained was covered by the general negligence instruction, which defined negligence and reasonable care and explained, among other things, that a driver has a duty to “maintain a proper lookout” and “drive at a speed no greater than is reasonable under the conditions then existing.” The general negligence instruction also included the following: “Bicyclists in Colorado have all the same rights and responsibilities applicable to drivers of any other vehicle.” 
25 ¶ 48 The primary difference between these two instructions was that the rejected bicycle-specific instruction explicitly stated that a bicyclist still has a duty of reasonable care even if he has the right-
of-way. But that concept was already encompassed in the instructions that the court provided. As noted above, the negligence instruction defined “reasonable care” as it potentially applied to Van Eaton’s conduct as a driver, and then informed the jury that the same principles also applied to Langley, as a bicyclist. The trial court reasonably concluded that the negligence instruction as provided would require the jury to decide, as part of its comparative negligence analysis, whether Langley exercised reasonable care under the conditions by riding through an intersection while he had the right-of-way. See Vikman v. Int’l Brotherhood of Elec. Workers, Local Union No. 1269, 889 P.2d 646, 662 (Colo. 1995) (“In determining whether jury instructions adequately inform the jury of the legal principles to be applied to the facts of the case, all of the instructions should be considered as a whole.”). Because the concepts in the bicycle-specific instruction were covered by instructions that the jury received, the trial court’s choice not to give the tendered instruction was not manifestly 
26 arbitrary, unreasonable, or unfair. See Harris Grp., Inc., 209 P.3d at 1195. C. Assumption of the Risk ¶ 49 Van Eaton also tendered the following instruction on assumption of the risk: “Negligence may also mean assumption of risk. A person assumes the risk of injury or damage if the person voluntarily exposes himself to such injury or damage with knowledge or appreciation of the danger and risk involved.” This instruction was taken from section 13-21-111.7, C.R.S. 2021, which requires a court to provide an instruction on the elements of assumption of risk “[i]n any trial to a jury in which the defense of assumption of risk is an issue for determination by the jury.” The trial court rejected the instruction because it concluded that issues of comparative negligence
3 were more applicable to the case than assumption of the risk. 3 The trial court actually used the phrase “contributory negligence,” but neither party assigns a contention of error to this verbiage and we assume that the court simply misspoke. See Watson v. Reg’l Transp. Dist., 762 P.2d 133, 136 (Colo. 1988) (“Colorado, by statute, replaced the doctrine of contributory negligence with a statutory system of comparative negligence. § 13–21–111, 6A C.R.S. (1987).”). 
27 ¶ 50 Van Eaton contends that the instruction was required because — notwithstanding the fact that he broke no traffic laws — Langley assumed the risk that Van Eaton would hit him when he timed the light, entered the construction zone of a busy intersection, did not make eye contact with Van Eaton, wore inconspicuous clothing, and did not use a headlight. We disagree. ¶ 51 Assumption of risk requires “knowledge of the danger and consent to it.” Carter v. Lovelace, 844 P.2d 1288, 1289 (Colo. App. 1992). On the other hand, like its predecessor contributory negligence, comparative negligence applies when a plaintiff takes risks “which he merely might have discovered by the exercise of ordinary care.” Appelhans v. Kirkwood, 148 Colo. 92, 99, 365 P.2d 233, 237 (1961) (quoting William L. Prosser, Law of Torts 305 (2d ed. 1955)). In Carter, the plaintiff legally tried to pass two vehicles on a two-lane road but was injured when the driver of one of them made a left-hand turn into a gravel lot. The trial court instructed the jury on assumption of risk, but the division reversed, holding that the plaintiff “did not assume a ‘known and obvious’ risk when he attempted to pass the vehicles because the road ahead was clear 
28 when he began passing the vehicles and the gravel turn-off was not visible.” Carter, 844 P.2dat 1290. ¶ 52 In reaching this holding, the division cautioned against construing assumption of the risk too broadly, noting that doing so would create the possibility that all drivers assume the risk of any accident resulting from such a passing maneuver. Id. Instead, the court determined that a jury instruction on contributory negligence (which was the law at the time) was sufficient to capture the plaintiff’s fault because, while “plaintiff’s attempt to pass defendant’s vehicle may have occurred in a negligent manner,” he “did not assume a known risk that the defendant would make a left turn in front of him since he did not know of such a risk, and could not have reasonably consented to take such a risk.” Id. ¶ 53 Van Eaton attempts to distinguish her situation from Carter by arguing that it is more akin to Vititoe v. Rocky Mountain Pavement Maintenance, Inc., 2015 COA 82. In Vititoe, the court found an assumption of the risk jury instruction was justified because the plaintiff saw the defendant’s vehicle at a stoplight, and, under the mistaken impression that it had begun moving forward as the light turned green, accelerated toward the intersection before 
29 crashing into the back of a trailer that the vehicle was towing. Id. at ¶ 72. Vititoe is distinguishable, however, because the plaintiff in that case “acknowledged that he saw [the defendant’s] truck in his lane of traffic and accelerated nevertheless.” Id. at ¶ 74. Because the plaintiff was an experienced motorcyclist, “a reasonable juror could conclude that any driver of such experience understands the risk and danger posed by a collision with another vehicle.” Id. at ¶ 72. ¶ 54 Here, by contrast, Langley did nothing but ride his bicycle legally in his lane. As the trial court instructed the jury, he had the right to believe that, when doing so, others — including drivers of vehicles around him — would obey applicable laws and regulations (unless there were reasonable grounds to believe otherwise). See CJI-Civ. 11:9 (2021); see also Prentiss v. Johnston, 119 Colo. 370, 376-77, 203 P.2d 733, 736 (1949). Those laws include those that required Van Eaton to comply with the yield signs at the merge point. § 42-4-703(4), C.R.S. 2021 (“[I]f a driver is involved in a collision with a vehicle in the intersection or junction of roadways after driving past a yield sign without stopping, such collision shall be deemed prima facie evidence of the driver’s failure to yield right-
30 of-way.”). Because there were no reasonable grounds to believe that other drivers would fail to comply with the traffic signage, Langley cannot be said to have had knowledge of the danger and to have consented to its outcome. Carter, 844 P.2d at 1289. The trial court accordingly did not abuse its discretion by declining to instruct the jury on Van Eaton’s affirmative defense of the assumption of risk. V. Admissibility of Subsequent Remedial Measures ¶ 55 On the day of the accident, yield signs stood on both sides of the street at the merge point where the collision happened. Two weeks after the accident, NCTC removed the yield signs and put stop signs in their place. Before trial — while it was still a party — NCTC filed a motion in limine to exclude evidence of that change, arguing that it “explicitly qualif[ied] as a subsequent remedial measure” because experts for both sides had “opined that the stop sign would have made the event less likely to occur.” The trial court granted the motion in a brief written order. ¶ 56 Van Eaton challenges that order, arguing that the bar on subsequent remedial measures does not apply to (1) the actions of a nonparty and (2) evidence that shows the existence of a dangerous 
31 condition. The first argument is not preserved and the second argument fails on the merits. A. Preservation ¶ 57 Van Eaton preserved her contention that the change from yield signs to stop signs is evidence of a dangerous condition, which should be exempt from the general rule excluding evidence of subsequent remedial measures, because she raised the issue in response to NCTC’s motion in limine, which the trial court granted. ¶ 58 But Van Eaton did not preserve her contention that this evidence was admissible once NCTC was dismissed from the case. Indeed, during the trial, she did not attempt to introduce this evidence after NCTC became a nonparty. Therefore, the trial court never had an opportunity to rule on the question whether the change in NCTC’s status altered the admissibility of the evidence of its subsequent remedial measures. Banning v. Prester, 2012 COA 215, ¶¶ 24-27 (appellate courts decline to address arguments that have not been adequately preserved). B. Standard of Review ¶ 59 We review a district court’s evidentiary rulings for an abuse of discretion. Leaf v. Beihoffer, 2014 COA 117, ¶ 9. A court abuses 
32 its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. Id. C. Analysis ¶ 60 Under CRE 407, “[w]hen, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.” Evidence of subsequent remedial measures can be offered for other purposes, however, “such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.” Id.; see also Core-Mark, 2012 COA 120, ¶ 28. ¶ 61 Two of the public policy goals served by Rule 407 are to encourage defendants to make repairs after an accident and to recognize that some accidents are caused by contributory (or comparative) negligence, the effects of which can be mitigated by additional safety measures. Rimkus v. Nw. Colo. Ski Corp., 706 F.2d 1060, 1064 (10th Cir. 1983) (interpreting the analogous federal rule). ¶ 62 Van Eaton contends that evidence of NCTC’s subsequent remedial measures was admissible to show that a dangerous 
33 condition existed at the scene at the time of the accident. We disagree because, under the circumstances here, that is precisely the type of evidence that the rule prohibits. CRE 407 bars the introduction of subsequent remedial measures to prove negligence, and whether a dangerous condition existed at the scene relates directly to the question whether the defendant breached a duty to the plaintiff by failing to address the dangerous condition before the accident. See Smit v. Anderson, 72 P.3d 369, 372 (Colo. App. 2002) (the elements of a negligence claim are duty, breach, causation, and damages). Langley’s own complaint alleges that the traffic control plan was “design[ed] and implement[ed] . . . in a negligent and dangerous manner, and fail[ed] to ensure a safe route of travel for bicyclists, such as Plaintiff.” Because the existence of a dangerous condition is inextricable from whether NCTC breached its duty, and therefore inextricable from the concept of negligence, the trial court properly excluded the evidence for this purpose. ¶ 63 Van Eaton relies on two cases to support her argument that the challenged evidence was admissible under Rule 407, Rimkus and Martinez v. W.R. Grace Co., 782 P.2d 827 (Colo. App. 1989). In Rimkus, applying the analogous federal rule, the Tenth Circuit 
34 Court of Appeals affirmed the district court’s admission of the defendant’s post-accident conduct. 706 F.2d at 1064. The district court had ruled that where a skier was injured in a collision with an unmarked hazard, and the ski patrol marked the hazard the day after the accident in accordance with its policy of marking hidden hazards, the post-accident conduct was admissible for the purpose of showing “the feasibility of marking the area.” Id. The Tenth Circuit affirmed the admission of the evidence on different grounds, holding that the testimony “was received not for the purpose of proving the negligence of the defendant, but rather was for the purpose of showing that the plaintiff was not guilty of contributory negligence,” and “for the purpose of undermining the testimony of [another witness] that he could see the outcropping” from some distance away. Id. at 1065. ¶ 64 Similarly, in Martinez, the division held that where a store owner painted a bump in the parking lot after the plaintiff tripped on it, evidence of this safety precaution was admissible to impeach the safety manager’s testimony that there was already a significant difference between the color of the asphalt and the color of bump, 
35 and that if there had not been a difference, the bump would have been painted pursuant to the store’s policies. 782 P.2d at 829. ¶ 65 Consistent with the text of CRE 407, Rimkus and Martinez both stand for the proposition that evidence of subsequent remedial measures can be admissible for some purposes other than showing a defendant’s negligence. Van Eaton, however, did not seek to introduce the evidence of the subsequent remedial measure for any of the non-negligence purposes enumerated in the Rule. Instead, as she puts it in her opening brief, “[e]vidence that NCTC replaced the yield signs with stop signs after the accident supports a reasonable inference that the confluence of traffic . . . in this construction zone[] created a dangerous condition and that the yield signs did not provide adequate warning of this danger.” In other words, Van Eaton wanted to introduce evidence of NCTC’s removal of the yield signs in order to show that the accident would have been less likely if stop signs had been there in the first place. But that is no more than a reframed negligence argument. And because CRE 407 expressly prohibits a party from introducing evidence of a defendant’s subsequent remedial measures to demonstrate 
36 negligence, the trial court did not abuse its discretion in excluding it. VI. Closing Argument ¶ 66 Van Eaton contends that the trial court improperly restricted the scope of her closing argument. Because she did not preserve this issue, however, we decline to consider it on the merits. ¶ 67 At the close of evidence, Langley’s attorney moved for a directed verdict on the question whether he was negligent and thus could have any award reduced under a theory of comparative negligence. He argued that “[t]he totality of the evidence regarding the conduct of Mr. Langley” was that, at the time of the accident, he was riding a properly equipped bicycle lawfully on the road, and that there was “zero evidence that conspicuity was even an issue.” Because there was no “prima facie evidence that [Langley] acted unreasonably,” his attorney argued, Langley was entitled to a directed verdict on the question of his comparative negligence. ¶ 68 In response, Van Eaton’s attorney argued that “there was plenty of evidence for the jury to find comparative negligence.” Asserting that “the standard isn’t whether he complied with statutory law, [but instead] whether he acted reasonably under the 
37 circumstances,” counsel noted that the jury could consider, among other things, whether it was reasonable for Langley to maintain his “speed of 17 miles an hour in that stretch of roadway,” whether he “appropriately scanned his surroundings,” and whether he was wearing conspicuous enough clothing under the circumstances. ¶ 69 The trial court denied the motion for a directed verdict, but then went on to say that “if there’s going to be argument about that what Mr. Langley did, which he was legally entitled to do, is somehow negligent . . . if there’s an objection to that kind of argument, you can probably expect that to be sustained.” This prompted Langley’s attorney to “present a motion in limine” regarding the argument “that somebody lawfully on a roadway traveling within the speed limit in the correct direction at the right location is somehow negligent or is doing something wrong in the conduct you just described.” ¶ 70 The court neither granted nor denied Langley’s request, pointing out that it was not clear exactly what arguments Van Eaton would present. Instead, the court responded much more generally, saying that it was “signaling what [it] consider[ed] to be proper argument,” “anticipating that everyone’s going to comply 
38 with that,” and stating that “there [would] be a correction in open court in front of the jury” if counsel’s closing was inappropriate. ¶ 71 Van Eaton’s attorney remained silent throughout this entire exchange. He did not ask the court to rule on Langley’s motion in limine, did not explain which arguments he planned to present, and did not ask the court clarify the bounds of what arguments it would deem acceptable. ¶ 72 During closing argument the next day, Van Eaton’s attorney told the jury that “nobody is disputing that Mr. Langley had a legal right to ride his bike through this area, but it doesn’t mean that it was the safe thing to do. There’s a difference between legally being allowed to do something —” At this point, Langley’s attorney objected and the court and counsel had the following exchange at the bench. [LANGLEY’S ATTORNEY]: Yesterday you asked if I had any objection to him making the argument that perfectly legal behavior was somehow less safe, that he was not to go into that area and to make an objection, so that’s what I’m doing. He’s now arguing that although it’s completely legal and permissible that it was less safe for him to enter into this area. 
39 [VAN EATON’S ATTORNEY]: I’m not going to argue any of the facts. It is a valid statement of law. I’m not going to address the green light, I’m not going to talk about any of that – [LANGLEY’S ATTORNEY]: He had a right to be on the road there. [VAN EATON’S ATTORNEY]: I’m not going to dispute that. THE COURT: Under those circumstances go ahead. ¶ 73 Thus, the court overruled Langley’s objection and Van Eaton’s attorney immediately followed up by “reiterat[ing]” to the jury that “just because doing something is legal does not mean it is safe.” Again, however, counsel did not ask the court to clarify the bounds of what would be permissible in closing, and he presented the remainder of his argument on this point without interruption from the court or opposing counsel. ¶ 74 Van Eaton argues that, although “defense counsel told the jury that something which is legal may not be safe, . . . he was not allowed to apply this abstract principle to the facts of the case (for example, to Plaintiff’s act of ‘timing the light’).” But counsel never attempted to make the argument that Van Eaton outlines on appeal, nor did he ask the court to rule on exactly what he could 
40 and could not say. Absent an explicit ruling by the court or any attempt by defense counsel to get one, we are left with nothing to review. See Liberty Bankers Life Ins. Co. v. First Citizens Bank & Tr. Co., 2014 COA 151, ¶ 25 (finding that the appellant’s contention of error was not sufficiently preserved because the appellant did not give the trial court notice of the issue or an opportunity to rule on it). Accordingly, because Van Eaton did not preserve this issue, we will not consider it. See Giguere v. SJS Fam. Enters., Ltd., 155 P.3d 462, 470 (Colo. App. 2006) (we do not address arguments raised for the first time on appeal). VII. Postjudgment Interest ¶ 75 Finally, Van Eaton contends that the trial court erred by awarding Langley postjudgment interest accruing at a rate of nine percent, instead of at the market-determined rate, as required by statute. Langley concedes this error. ¶ 76 Section 13-21-101, C.R.S. 2021 imposes different statutory interest rates on damage awards depending on whether the judgment is appealed. When a judgment debtor files a notice of appeal, “the rate at which postjudgment interest accrues becomes the market-determined rate, rather than the [prejudgment interest] 
41 rate of nine percent.” Rodriguez v. Schutt, 914 P.2d 921, 928 (Colo. 1996). This means that once the judgment debtor files a notice of appeal, the right to continuing prejudgment interest is extinguished, and the statutory postjudgment rate instead begins to apply — retroactively — as of the date of the judgment. Because, notwithstanding her appeal, the court erroneously ordered Van Eaton to pay interest at the prejudgment rate of nine percent, we vacate that portion of the judgment and remand the case so that the court may award interest at the statutory postjudgment rate. VIII. Conclusion ¶ 77 We vacate the award of postjudgment interest at a fixed rate of nine percent and remand the case for the court to award postjudgment interest at the market rate. In all other respects, we affirm the judgment. JUDGE NAVARRO and JUDGE PAWAR concur.